**In re GREYSTONE III JOINT VENTURE, Debtor.**

**Bankruptcy No. 88–10968.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

June 6, 1989.

Adrian M. Overstreet, Kammerman & Overstreet, P.C., Austin, Tex., for debtor.

John Flowers, John H. Reid, Neil L. Sobol, Locke Purnell Rain Harrell, P.C., Dallas, Tex., for Phoenix Mut. Life Ins. Co.

## DECISION ON CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION, AS MODIFIED

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Second Amended Plan of Reorganization of Debtor (as modified) together with the objection thereto by Phoenix Mutual Life Insurance Company ("Phoenix"). This decision focuses on those critical issues on which the parties focused at the hearing and in their post-submission briefs. The court finds that the balance of the findings required to confirm a plan under Section 1129 of the Bankruptcy Code have been successfully established by the debtor and will be set out in detail in the confirmation order.

## I. THE FACTS AND POSTURE OF THE CASE

The plan proposes to pay both trade debt of approximately $10,000 and the Code-created deficiency claim of Phoenix Mutual (approximately $3,475,000) slightly over three (3) cents on the dollar. The plan also proposes to pay 1987 ad valorem taxes in excess of $108,000, and to assure payment of 75% of tenant security deposit claims.

The partnership currently has on hand approximately $101,000, more than enough to pay off the trade in full, though nowhere near enough to pay even the remaining taxes, much less Phoenix' deficiency claim.

Absent bankruptcy, Phoenix is a nonrecourse creditor and would have no claim at all beyond its secured claim against either the partnership or its general partners. The trade debt and the tenants, on the other hand, have recourse under Texas law against both the partnership and the general partners, and the plan does not purport to restrict or eliminate that recourse. Texas Uniform Partnership Act, Tex.Rev.Civ. Stat.Ann., Art. 6132b, § 40 (West pamphl. ed. 1988); *see Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987) (plan's discharge of nondebtor entity withstood collateral attack under principles of *res judicata* where creditor failed to timely object to plan). The debtor's partners intend to retain their equity interest in the venture with a capital infusion of $500,000, to be used both to fund payments to creditors and for future operations.

All creditors other than Phoenix have supported the plan. The plan was amended at the confirmation hearing to delete the affirmative statement that general partners would satisfy the balance of trade debt claims[1] and to reduce the term of repayment for Phoenix' secured claim from thirty to ten years, with a balloon at the end.

Phoenix still objects to the plan, contending that (1) the plan is either not proposed in good faith because the plan improperly classifies the trade debt as a separate impaired class or, alternatively, unfairly discriminates by "artificially impairing" the trade debt and (2) the plan cannot be forced upon Phoenix over its objections anyway because it is not fair and equitable with respect to Phoenix' deficiency claim. The debtor responds that the Code contemplates flexibility in classification, so that making use of the tools afforded by the

---

1. The debtor urged that the statement in the plan was intended to be nothing more than a restatement of Texas law. In fact, the general partners were not parties to the plan, other than in their capacity as equity investors, so the plan could not purport to bind them to an obligation to which they had not affirmatively consented anyway.

Code cannot, by definition, be anything other than good faith as that term is used in Section 1129(a)(3). The debtor adds, in the same vein, that its treatment of the trade is intended to come within the rule of law announced by this court in *In re Meadow Glen, Ltd.*, 87 B.R. 421, 425 (Bankr.W.D. Tex.1988), in order to *avoid* a finding that the plan "unfairly discriminates." Finally, the debtor argues that the capital infusion of $500,000 proposed by the partnership's partners brings the plan within the exception announced in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

## II. ANALYSIS OF THE LAW

Phoenix argues that this debtor's plan takes improper advantage of Chapter 11, and subverts the intent of Congress in the process. Phoenix complains that the plan impermissibly silences Phoenix, by putting the trade debt into a separate class which has enthusiastically accepted the plan. This, Phoenix urges, subverts the "clear intentions" of Congress in enacting Section 1129(a)(10). Meanwhile, the debtor's principals are "buying" their way back in ostensibly under the exception to the absolute priority rule announced in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), undermining the "veto" which Phoenix believes Congress intended to confer on undersecured nonrecourse lenders by virtue of Section 1129(b)(2)(B). According to Phoenix, the debtor has taken advantage of creative classification, then "artificially impaired" that class in order to give the debtor an accepting class, avoiding domination by Phoenix' Code-created deficiency claim. The cash infusion meanwhile skirts the absolute priority rule of Section 1129(b)(2)(B) that the objecting unsecured class either be paid in full or that junior interests retain or get nothing under the plan. Phoenix is vociferous in urging that the debtor's tactics circumvent the structure of the Code. The argument presupposes, however, that Congress intend the secured lender in cases such as this to have the final say over whether a plan should be confirmed. That presupposition gives more credit to Congress and its intentions than Congress appears to be due, however.

### A. An Historical Perspective on the Role Envisioned for Secured Creditors in Single–Asset Real Estate Cases under the Bankruptcy Code

Prior to the passage of the Bankruptcy Reform Act in 1978, single asset real estate debtors, employing Chapter XII of the Bankruptcy Act, could "write down" their secured debt while the market was low, then enjoy the appreciation realized in excess of the written-down mortgage when the market rebounded. *See Great National Life Insurance Co. v. Pine Gate Associates, Ltd.*, 2 B.C.D. 1478 (Bankr.N.D.Ga. 1976) (hereinafter *Pine Gate* ). According to the *Pine Gate* court,

> Nowhere in Chapter XII is there any exclusion of the benefit of Chapter XII to a debtor having only one secured creditor. The history of the creation of Chapter XII, which was to provide a remedy to property owners to avoid foreclosure under distressed economic conditions indicates otherwise.... [T]he contract rights of a secured creditor in the property of which a debtor is the legal or equitable owner may be modified or altered even without the consent of such secured creditor so long as the secured creditor receives adequate protection under Section 461 to realize the value of its lien. Retention of property is the statutory scheme of Section 461(11)(c) and adequate protection, rather than consent, of the secured creditor is its keystone.

*Id.* at 1487; *see also Matter of Accousti*, 2 B.C.D. 1093 (Bankr.D.Conn.1976); *Matter of Marietta Cobb Apartments*, 3 B.C.D. 720 (Bankr.S.D.N.Y.1977); *Matter of Hobson Pike Associates, Ltd.*, 3 B.C.D. 1205 (Bankr.N.D.Ga.1976).

These cases construing Chapter XII (which until the early 1970's had fallen into disuse) arose even as Congress was undertaking a major overhaul of the bankruptcy laws. *See generally* "Report of the Commission on the Bankruptcy Laws of the United States," H.R.Doc. No. 137, 93rd Cong, 1st Sess (1973). By 1977, the House

had completed its final proposed draft of a new Bankruptcy Code, H.R. 8200, which combined former reorganization chapters X, XI, and XII into a single chapter (Chapter 11), optimistically designed to be flexible enough to meet all the needs for which the three chapters were created in the Chandler Act of 1938. 124 Cong Rec H11117, 95th Cong, 2d Sess (daily ed. Sept. 28, 1978) (remarks of Rep. McClory). The House version adopted many of the recommendations of the Bankruptcy Commission, and took a liberal approach in its provisions which decidedly favored reorganization. H.R.Rep. No. 595, 95th Cong, 1st Sess 220 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. In its confirmation section, the House version permitted confirmation over the objections of dissenting secured creditors so long as their claim was essentially "adequately protected," (cf. 11 U.S.C. (repealed) § 861), and over the objections of dissenting impaired unsecured classes of creditors so long as no junior classes received property on account of their junior claims (a modified version of the Chandler Act's "fair and equitable" standard, codified and preserved in Chapter X of the Bankruptcy Act). H.R. 8200, § 1129, 95th Cong, 1st Sess (1977). Section 506(a) of the proposed bill defined a secured claim in terms of the value of the collateral securing the debt, as had Chapter XII of the Bankruptcy Act. Section 502, meanwhile, provided that claims would be disallowed if unenforceable against the debtor for any

reason. One such unenforceable claim would, of course, be a "deficiency" claim asserted by a nonrecourse lender. Under the House version, a plan could conceivably be confirmed even though no impaired class voted in favor of the plan, because there was no antecedent to current Section 1129(a)(10) in H.R. 8200. Under the House version, then, a Chapter XII-type reorganization would be permitted under new Chapter 11 as well. *See Matter of Marietta Cobb Apartments*, 3 B.C.D. 720 (Bankr.S. D.N.Y.1977); *Matter of Hobson Pike Associates, Ltd.*, 3 B.C.D. 1205 (Bankr.N.D.Ga. 1976) (single asset real estate cases with only one creditor—the secured creditor—confirmed over the objections of that creditor).

By the next year, the Senate came up with its own, somewhat more conservative version of the Bankruptcy Code. S. 2266, 95th Cong, 2d Sess (1978). In its reorganization sections, the Senate version preserved many of the provisions of Chapter X of the Act, at least for publicly held companies. S. 2266, §§ 1128, 1130, 95th Cong, 2d Sess (1978). It also contained a specific section severely restricting how real estate liens could be treated.[2] Finally, in an evident reaction to these two then-recent cases, S. 2266 required that at least one class of creditors, exclusive of insiders, must have accepted the plan in order for it to be confirmed. S. 2266, § 1130(a)(12), 95th Cong, 2d Sess (1978).[3]

**2.** (a) Notwithstanding any other provision of this chapter or section 506(a) of this title, the claim or interest of a creditor secured by a lien upon or security interest in property of the estate which is real estate, chattels real, leasehold estates in real property, or fixtures, to the extent that such claim or interest was incurred for the purchase or improvement of such property, may be altered or modified in the plan only in the following manner:

(1) where a default in payment of an installment claim or interest is existing the claim or interest of the creditor may be reinstated whether or not reinstatement would be permitted under otherwise applicable law with all payments then in default to be amortized equally over the life of the reinstated loan at the same rate of interest; or

(2) the claim or interest of the secured party may be extended as to payment on a reasonable, equitable and practicable basis as

long as the value of the claim or interest as extended would be the indubitable equivalent of the claim or interest if reinstated under subsection (1) above.

S. 2266, § 1131(a), 95th Cong, 2d Sess (1978).

**3.** The two cases came out within a few weeks of each other in September 1977, while the Senate version was undergoing drafting. *See Matter of Marietta Cobb Apartments*, 3 B.C.D. 720 (Bankr. S.D.N.Y.1977); *Matter of Hobson Pike Associates, Ltd.*, 3 B.C.D. 1205 (Bankr.N.D.Ga.1976). In each case, the bankruptcy judge, construing Section 461(11) of Chapter XII of the Bankruptcy Act, found no prohibition on confirmation of a plan involving only one creditor, the secured creditor, over that creditor's objections, so long as the plan provisions themselves afforded adequate protection of the value of the secured creditor's lien interest. Both decisions were well-reasoned and correctly refuted the continuing application of a judicial gloss to the contrary

The two versions thus represented two philosophically inconsistent positions insofar as how single asset real estate cases might fare under the Bankruptcy Code. The House version would have continued the rehabilitation-oriented policies of Chapter XII, while the Senate version apparently gave ear to the complaints of secured creditors who had been burned under that very chapter. Not until the floor managers for each bill met in conference was there any effort to reconcile the inconsistencies. Unfortunately, the legislative history is largely unilluminating as to what precisely transpired in those meetings, and we have only the comments of the floor managers in the Congressional Record to give any hint to their thinking on the subject.

What we do know is that Congress retained the House version's cram-down powers and rejected "as unnecessary" the restrictions on real estate lien treatment found in the Senate version, "in light of the protection given a secured creditor under Section 1129(b) of the House amendment." 124 Cong Rec H11115, 95th Cong, 2d Sess (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).[4] To mollify the concerns raised by secured creditors as a result of the *Pine Gate* decision, the floor managers devised a new subsection (b) for Section 1111. This complicated little provision was designed to achieve two basic tasks. First of all, it gave undersecured nonrecourse creditors a Code-created deficiency claim, solely for use in Chapter 11 reorganizations, overriding the general provision in Section

that had its genesis in cases which predated changes to Chapter XII made in 1952. *Matter of Hobson Pike Associates, Ltd.,* 3 B.C.D. at 1211–1214; *see In re Herweg,* 119 F.2d 941 (7th Cir. 1941); *see also* Dole, "Judicial Gloss," *The Chapter XII Cram–Down Provisions,* 82 Comm.L.J. 197–204 (June 1977). Both courts noted a congressional policy favoring cram-down as a way of achieving reorganization values over the objections of recalcitrant creditors whose property rights were satisfactorily addressed in the adequate protection scheme of the statute. *Matter of Marietta Cobb Apartments,* 3 B.C.D. at 724; *Matter of Hobson Pike Associates, Ltd.,* 3 B.C.D. at 1210. Finally, both cases underlined just how nonsensical it was for a secured creditor to complain that there were no other impaired creditors in favor of the arrangement. Said Judge Babbitt in *Marietta Cobb Apartments,* quoting a then-recent commentator:

> ... it is not terribly difficult for the enterprising real estate debtor to incur other creditor obligations, perhaps even resulting in secondary and mechanics or materialmen's liens on the property. The reorganization plan can propose payment of all or part of these claims in cash, assuring the favorable vote of those classes.

*In re Marietta Cobb Apartments Co.,* 3 B.C.D. at 724, *quoting* Lifton, *Real Estate in Trouble,* 31 Bus.Law. 1927, 1968 (1976). Even more acerbic was Judge Norton in *Hobson Pike Associates:*

> The true design of ... Chapter XII is not whether there are creditors to accept the plan in writing, but whether the plan provides the necessary "adequate protection" ...
>
> ...
>
> Should the *Herweg* ... view prevail, contrary to the strong Chapter XII rehabilitation intent, that view would seem to offer an invitation to debtors and attorneys practicing in the bankruptcy field to create some secured or

unsecured debt on the eve of the Chapter XII filing in order to acquire some creditor acceptance of the plan.... It has been observed by bankruptcy attorneys to this court that unsecured debt ... is easy to produce just prior to filing if unsecured debt is a prerequisite to enjoyment by the debtor of the statutory privileges [of reorganization].... Such fabrication of unsecured debt to meet the criticism of *Herweg* ... would be difficult for courts to recognize, if indeed, to do so would defeat jurisdiction or remove availability to this debtor relief chapter [sic].... [H]ow many unsecured creditors and/or how much debt other than the secured debt must be found to assent in order to allow a plan to be confirmed? ... Will one creditor for a $1.00, $10.00, $100.00, $1,000.00 debt suffice to sustain the required acceptances? Must the accepting creditor class be significant in number and/or amount in comparison to the objecting creditor? If so, what amount, how many? Surely such a statutory construction is an unsatisfactory result not intended by Congress.

*Id.* at 1210, 1213–14.

4. Congress ended up tilting in favor of the House version, a bent acknowledged by the Supreme Court subsequently:

> By permitting reorganization, Congress anticipated that the business could continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H.R.Rep. No. 95–595, p. 220 (1977). Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than 'if sold for scrap.' *Ibid.*

*United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983), *quoted in* M. Bienenstock, *Bankruptcy Reorganization,* p. 1 n. 2 (PLI 1987).

506(a) which would otherwise allow nonrecourse secured creditors a claim only to the extent of the value of their collateral. *See* 11 U.S.C. § 506(a). Second, it allowed such secured creditors to "opt-out" of recourse treatment, in which case the plan would have to "allow" the secured claim in an amount equal to the amount of the value of secured creditor's debt, rather than the secured creditor's collateral.[5] Section 1111(b) thus gave the nonrecourse lender both a voice and a choice. In the words of a respected commentator,

> section 1111(b) protects the legitimate expectation of the secured lender that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors.

5 *Collier on Bankruptcy*, ¶ 1111.02[1], p. 1111–14 *et seq.* (15th ed. 1985).

In addition to adding Section 1111(b), the conferees also tried to beef up Section 1129(b), expressly using the terms of art "fair and equitable" and "unfairly discrimi-nates" in § 1129(b)(1). Each of these terms carried their own judicial baggage into the cram-down portion of Section 1129.

The floor managers also carried into the joint draft the Senate's provision that at least one class of creditors, exclusive of insiders, would have to accept the plan before it could be confirmed. They did so without explanation or comment, and apparently without consideration of either that section's relationship or impact upon the cram-down provisions brought into the draft from the House version.[6]

The conferees apparently gave no particular thought to the impact of Section 1122 on the cram-down provisions of the Code, not anticipating how so-called "creative classification" schemes might affect a debtor's ability to gain access to the cram-down powers.[7] Both versions of the draft enactment contained nearly identical provisions regarding classification, and the legislative history only confirms that Congress did not envision any particular restrictions on the creative use of the classification powers,

5. Under the latter scenario, in a cram-down, the plan would have to allow the claim in an amount equal to the debt, but the payment stream used to pay the claim need only have a present value equal to the value of the property. Then, in the event of a post-confirmation default, the secured creditor would have full recourse against the collateral up to the amount of its debt, enjoying any appreciation in the value of the collateral since confirmation.

6. Recall that the Senate version had the requirement of at least one accepting class even though it did *not* have a "cram-down" provision. Its inclusion first in the Senate version and ultimately in the final version as enacted is probably traceable to the then-recent decisions in *Hobson Pike* and *Marietta Cobb Apartments*, discussed *supra*, and not to any interplay with cram-down. *See* 5 *Collier on Bankruptcy*, ¶ 1129.02[10], p. 1129–36.10 (15th ed. 1987). In floor remarks, the floor manager of the bill in the Senate commented with regard to the new cram-down provisions that

> Section 1129(b) is new. Together with section 1111(b) and section 1129(a)(7)(C), this section provides when a plan may be confirmed, notwithstanding the failure of an impaired class to accept the plan under section 1129(a)(8).

124 Cong Rec S17420, 95th Cong, 2d Sess (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini).

In the context of these remarks, Section 1129(a)(10) is noticeable by its absence.

While the policy it serves is questionable and undoubtedly leads to unfortunate "gaming" on the part of debtors, Section 1129(a)(10) nonetheless clearly evinces an apparent belief on the part of Congress that the scenario played out in *Hobson Pike Associates* and *Marietta Cobb Apartments* (i.e., confirmation of a plan accepted by no one and over the objections of the only affected creditor) is not an appropriate use of the bankruptcy powers. For better or worse, therefore, unless some disinterested, impaired third class of claims (other than the debtor and the affected secured creditor) favors the proposed reorganization, reorganization under the Bankruptcy Code, no matter how salutary or equitable, will simply not be available to the debtor. *See Anderson Oaks (Phase I) Limited Partnership*, 77 B.R. 108, 111 (Bankr.W.D.Tex. 1987). Apart from overruling the odious result in *Hobson Pike Associates* and *Marietta Cobb Apartments*, however, Section 1129(a)(10) appears to serve no other function particularly related to cram-down. *But see* 5 *Collier on Bankruptcy*, ¶ 1129.02[10] at p. 1129.36.10 (15th ed. 1987).

7. Floor comments note the interplay of Sections 1111(b), 1129 and 1124 (relating to what constitutes an impaired class), but make no reference to Section 1122. 124 Cong Rec H11103, 95th Cong, 2d Sess (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).

other than that (1) dissimilar claims could not be forced into the same class and (2) an impaired and dissenting class could not be treated differently than another class of equal dignity. 11 U.S.C. §§ 1122(a), 1129(b); H.R.Rep. No. 595, 95th Cong, 1st Sess 406, 414–15 (1977).

Congress thus adopted an unclear middle position on the question of single asset real estate cases in bankruptcy. It could have given secured creditors veto power over reorganizations had it enacted the Senate version. It could also have effectively gagged the secured creditor had it settled solely on the House version. Instead, Congress made sausage and, as a result, courts and practitioners are left with a reorganization chapter which, when applied to single asset real estate cases, is rife with inconsistencies.

For example, Section 1111(b) "ungags" the secured creditor by giving it an unsecured claim which the drafters no doubt contemplated would dominate the unsecured class, forcing a donnybrook at cramdown over whether the debtor could retain any interest in the estate without paying off the Code-created deficiency. By happenstance, that same deficiency claim will, in the usual real estate case, because it dominates the unsecured class, threaten the debtor's plan under Section 1129(a)(10). By equal happenstance, however, the flexibility of Section 1122 seems to permit the debtor to easily circumvent that pitfall by simply preserving, impairing, and separately classifying trade debt. *See Hobson Pike Associates, Ltd.*, 3 B.C.D. at 1213. The only limitation on that tactic apparent on the face of the Code is the requirement that, as between the trade and the deficiency claim, the plan not unfairly discriminate. A creditor "victimized" by such tactics will be quick to point to Section 1129(a)(3), which requires the plan to have been proposed "in good faith," but that position is tenable only if one first assumes that the *purpose* of Section 1129(a)(10) was to assist in preventing debtors from obtaining access to the cramdown provisions, an assumption which this court finds is suspect. As we shall see below, the "good faith" argument is undercut by the expansive and flexible classification and impairment sections of the Bankruptcy Code, the use of which will in most cases also satisfy the technical requirements of Section 1129(a)(10). If any purpose can be divined from the Code's structure, it is that, in real estate cases such as this, the ultimate confrontation will take place over whether the plan can satisfy the stringent requirements of cram-down imposed by Section 1129(b), not whether it can satisfy the hyper-technical (and largely impractical) requirements of Section 1129(a)(10). This court cannot find any particular congressional intent, either expressed or implied in Congress' sausage-making exercise, that compels this court to read together the various Code provisions in such a way as to confer on secured creditors in cases such as these the veto power for which Phoenix now lobbies.

By the same token, however, the debtor's powers are not unrestricted. We thus explore those restrictions in light of this plan. We first look at the classification question, then examine the *Case* exception. If the classification and treatment scheme pass muster, we will then turn to whether the *Case* exception is available to overcome the absolute priority rule and, if so, whether it is available to this debtor in this case.

## B. THE CLASSIFICATION QUESTION

### 1. The flexibility of classification permitted by Section 1122

*Collier*'s advises that a debtor enjoys considerable flexibility in the manner in which it classifies claims:

> Since Congress obviously intended that the proponent of a plan have the flexibility to separately classify certain general unsecured claims and thereby leave such claims unimpaired if such treatment was advantageous to the debtor, the argument that all claims of the same legal nature must be included within one class is not persuasive.

5 *Collier on Bankruptcy*, ¶ 1122.04, p. 1122–18 (15th ed. 1985). Some cases since the Code's enactment have been less certain about that flexibility, however, often

responding to factual scenarios which a given court found offensive or abusive. *See Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir.1984); *In re S. & W Enterprise, Inc.*, 37 B.R. 153 (Bankr.N.D.Ill.1984); *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983), *rev'd on other grounds*, 39 B.R. 654 (S.D.N.Y.1984); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 831 (Bankr.S.D.N.Y.1982). These cases condemn the practice of creating a separate class for a given group of unsecured creditors apart from other unsecured creditors, finding in the tactic an attempt to "gerrymander" in order to satisfy the "one accepting class" requirement of Section 1129(a)(10).[8] They support a more restrictive "read" of Section 1122 by relying on Act cases which construed Section 197 of the Bankruptcy Act.[9] *See In re Los Angeles Land & Investments, Ltd.*, 282 F.Supp. 448, 453 (D.Hawaii 1968), *aff'd*, 447 F.2d 1366 (9th Cir.1971); *In re Scherk v. Newton*, 152 F.2d 747 (10th Cir.1945). By their interpretation, these cases hold that all claims of similar legal status *vis-a-vis* their entitlement to estate assets must be placed within the same class.[10] These cases also point to the reference in the legislative history to a codification of "existing case law surrounding the classification of claims and equity securities." S.Rep. No. 989, 95th Cong, 2d Sess 118 (1978), U.S.Code Cong. & Admin.News 1978, p. 5904.

Other cases have criticized this rigid interpretation of Section 1122. The Sixth Circuit, for example, pointed out that both the legislative history and prior case law are inconclusive because Section 1122 is the successor not only to former Section 197 (part of Chapter X under the Act) but also to former Section 351 (part of Chapter XI under the Act). *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 585 (6th Cir.1986). The latter section states only that

> For the purposes of the arrangement and its acceptance, the court may fix the division of creditors into classes and, in the event of a controversy, the court shall after hearing upon notice summarily determine such controversy.

11 U.S.C. (repealed) § 751 (1976). Because under Chapter XI, only unsecured claims could be adjusted, former Section 351 opened the door to multiple classes of claims similar in legal nature. Section 1122 on its face did not incorporate the more restrictive language of former Section 197 and the Sixth Circuit found no reason to re-insert such a restriction just because of a passing reference in the legislative history. *Id.* at 586–87. Other circuits have agreed with the Sixth Circuit's conclusion. *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1061 (3rd Cir.1987); *Hanson v. First State Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987); *see Matter of LeBlanc*, 622 F.2d 872 (5th Cir.1980) (construing a Chapter XII Bankruptcy Act case); *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.D.C.1986).

Other bankruptcy courts have also rejected a restrictive reading of Section 1122. *See, e.g., In re Ag Consultants Grain Div., Inc.*, 77 B.R. 665, 670–76 (Bankr.N.D.Ind.1987); *In re Northeast Dairy Coop Federation, Inc.*, 73 B.R. 239, 249 (Bankr.N.D.N.Y.1987); *In re Mason & Dixon*

---

**8.** If nothing else, the practice and the uproar it has created bears out Judge Norton's criticism of imposing such a requirement as a precondition to confirmation. *Matter of Hobson Pike Associates, Ltd.*, 3 B.C.D. at 1213; *see* note 3, *supra*.

**9.** That section, which was part of Chapter X, read as follows, in pertinent part:

> For the purposes of the plan and its acceptance, the judge shall fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock....

11 U.S.C. (repealed) § 597 (1976).

**10.** One concern of Act cases was the possibility that claimants with the claims of equal dignity against a *particular item of property* might be separately classified, thereby depriving one group of claimants of valuable lien rights. *See Seidel v. Palisades–on–the–Desplaines (In re Palisades–on–the–Desplaines)*, 89 F.2d 214, 217 (7th Cir.1937) ("all creditors of equal rank with claims against the same property should be placed in the same class"); *Scherk v. Newton*, 152 F.2d 747, 751 (10th Cir.1945) ("all creditors of equal rank with claims against the same property should be placed in the same class").

Lines, Inc., 63 B.R. 176, 181 (Bankr.M.D.N. C.1986); In re Huckabee Auto Co., 33 B.R. 132, 137 (Bankr.M.D.Ga.1981). The court in Ag Consultants pointedly notes that even the reliance on Bankruptcy Act cases may be misplaced, as many of those cases did permit flexible classification, often at least in part because it would contribute to confirmation of the plan. See In re Ogden Apartment Building Corp., 90 F.2d 712 (7th Cir.1937); see also Seidel v. Palisades-on-the-Desplaines (in re Palisades-on-the-Desplaines), 89 F.2d 214 (7th Cir.1937); Brockett v. Winkle Terra Cotta Co., 81 F.2d 949 (8th Cir.1936); In re Dudley v. Mealey, 147 F.2d 268 (2d Cir.1945). At the very least, these Act cases placed their emphasis on the practicalities of a given case, with an eye toward favoring rehabilitation, and the Ag Consultants court wisely observed that even the oft-cited Scherk v. Newton case holds only that creditors of equal rank with claims against the same property should be placed in the same class, not that they must be. In re Ag Consultants Grain Division, Inc., 77 B.R. at 674, citing Scherk v. Newton, 152 F.2d at 751. Finally, Ag Consultants reminds us that a court's first duty is to interpret a given statute as it is written,

> unless it is demonstrably at odds with the intentions of the statute's drafters. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).
>
> We find no ambiguity in 11 U.S.C. § 1122. Section 1122 allows a claim or interest to be placed in a particular class only if such claim is substantially similar to the other claims or interests of such class. It does not require that similar classes be grouped together but merely that any group be homogeneous. [citations omitted].

Id.

■ This court joins with Ag Consultants and the above-cited circuit court authority in finding

> unpersuasive the current line of cases that hold that Congress intended all unsecured claims of a similar nature to be grouped within one class.... A crit-

ical review [reveals that] those cases attempt[ ] to create a statutory requirement where none exists and a reliance on pre-Code law and Act statutory requirements.

Id. at 675. Section 1122 authorizes flexibility in classification in furtherance of the rehabilitative intentions of Chapter 11.

### 2. The propriety of the classification scheme

The flexibility to "classify around" a secured creditor's Code-created deficiency claim is not unbridled, however. The Fifth Circuit has noted that

> As a general rule the classification in a plan should not do substantial violence to any claimant's interest. The plan should not arbitrarily classify or discriminate against creditors. The fact that bankruptcy courts are courts of equity, however, allows exceptions to any strict rules of classifications of claims. A bankruptcy court can permit discrimination when the facts of the case justify it.

Brinkley v. Chase Manhattan Mortgage and Realty Trust (Matter of LeBlanc), 622 F.2d 872, 879 (5th Cir.1980).

■ Examining the propriety of the classification scheme focuses on the peculiar equities of each case, leading a court to exercise its equitable powers in the interests of forwarding the reorganization policy which underlies the Bankruptcy Code. United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1982); H.R.Rep. No. 595, 95th Cong, 1st Sess 220 (1977).

Phoenix contends however that there must be a good reason to separately classify the trade in this case. Phoenix argues that the separate classification of the trade coupled with their unjustified impairment represents blatant "gerrymandering" which, if nothing else, violates the "good faith" requirement imposed by Section 1129(a)(3). Phoenix thus tries to bring itself within the facts of Pine Lake Village, supra. In that case, separate classification of a mortgage deficiency was not permitted because the sole purpose, according to the court, was to permit the plan to satisfy

Section 1129(a)(10), which requires the acceptance of at least one class of impaired creditors. A single class of unsecured creditors there, as here, would have been dominated by the deficiency claim of the secured creditor. *Pine Lake Village Apartment Co., supra.* As we have indicated above, however, the underpinnings of *Pine Lake Village* are shaky. So also is the logic that Section 1129(a)(10) operates as a statutory gatekeeper to bar access to cram-down.[11] Finally, there is Fifth Circuit authority that, so long as a plan is proposed with the legitimate and honest purpose to reorganize and is not *otherwise* prohibited by law, it is a plan which satisfies the "good faith" requirement of Section 1129(a)(3). *Matter of Sun Country Development, Inc.,* 764 F.2d 406, 408 (5th Cir.1985).[12]

By the same token, however, recent cases have felt constrained to "draw the line" on the extent to which a plan can creatively classify creditors, though they have had some difficulty in articulating precisely why. For example, in *U.S. Truck,* the Sixth Circuit observed that

In this case, U.S. Truck is using its classification powers to segregate dissenting (impaired) creditors from assenting (impaired) creditors (by putting the dissenters into a class or classes by themselves) and, thus, it is assured that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court. We agree with the Teamsters Committee

that there must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir.1986); *In re Jersey City Medical Center,* 817 F.2d 1055, 1061 (3rd Cir.1987) (*citing U.S. Truck*); *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987) (finding no justification for separate classification in this case); *In re Northeast Dairy Coop Federation, Inc.,* 73 B.R. 239, 250 (Bankr.N.D.N.Y.1987).

■ If we take as a given that some independent reasonable grounds for separate classification must be found in order to authorize the proposed classification scheme, then one recognized rationale is a demonstrated economic need to treat certain otherwise similar claims differently. In *U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir. 1986); *In re Jersey City Medical Center,* 817 F.2d 1055, 1061 (3rd Cir.1987); *In re Ag Consultants Grain Div., Inc.,* 77 B.R. 665, 676 (Bankr.N.D.Ind.1987). The legal character of a claim may also itself justify both disparate classification and treatment under the authority of a number of Act cases. Unsecured creditors may, under special circumstances, be divided into separate

**11.** As noted *supra,* there is nothing in the legislative history to indicate that Congress intended to "link" Section 1129(a)(10) with the cram-down powers. To the contrary, the provision was in the Senate version, which did *not* have a cram-down provision. *See* discussion *supra* at note 3. Congress' response to the cram-down power incorporated from the House bill was Section 1111(b), which merely assured that, if a debtor tried to force a plan onto a non-recourse lender, the plan would have to pass muster under the modified absolute priority rules of Section 1129(b) both with respect to the secured claim (echoing Section 461(11) of the Bankruptcy Act) and to the Code-created unsecured claim (echoing the "fair and equitable" standard of Chapter X of the Bankruptcy Act). It seems not to have occurred to Congress that Section 1129(a)(10) might be used to bar access to the

cram-down powers. Even if it had, the section's utility was undercut by the generous classification and impairment provisions of Chapter 11. 11 U.S.C. §§ 1122, 1123(a), 1124; *see* discussion *infra.*

**12.** First, Brite's claim that the unsecured creditors' status was changed to effectuate the cram down does not go to whether the purpose of Sun Country's proposed plan is to reorganize is whether the plan has a reasonable hope of success. *Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith. Id.* at 408 (emphasis added). Similar logic carries over to debtors' using the classification mechanism, which was made available to debtors by Congress, to carry out a reorganization.

classes where the legal character of their claims is such as to accord them a status different from other unsecured creditors. *In re Los Angeles Land of Investments, Ltd.*, 282 F.Supp. 448, 453 (D. Hawaii 1968), *aff'd*, 447 F.2d 1366 (9th Cir.1971); *Scherk v. Newton*, 152 F.2d 747, 751 (10th Cir. (1945) (classification is simply a method of recognizing difference in rights which call for difference in treatment); *see also Seidel v. Palisades-on-the-Desplaines (in re Palisades-on-the-Desplaines)*, 89 F.2d 214 (7th Cir.1937). The facts of this case justify disparate classification of the trade debt on both grounds.

First of all, trade creditors are not of equal legal status with Code-created deficiency claims. They have an independent claim against the general partners which the deficiency claim does not enjoy, because Section 1111(b) does not confer a comparable right. The "recourse claim" is only good against the debtor's estate in the Chapter 11 case. Section 1111(b) does not purport to create a claim cognizable under state partnership law against the partners.

The transformation of nonrecourse claims into recourse claims is for distribution purposes only in a Chapter 11 reorganization cases where the debtor has been given the power to retain encumbered property (over the objection of the secured creditor) for use in its plan of reorganization.. "It was obviously not intended by according recourse [status] to non-recourse. claims that the holders of these claims would be given any additional rights under state law." 3 *Norton Bankr.L. & Prac.* § 57.02

.     .     .     .     .     .

... conversion of non-recourse claims to recourse claims is the "price" the debtor pays to use encumbered property in its reorganization over the objection of the secured creditor. If the property is voluntarily or involuntarily returned to the secured creditor, the non-recourse secured creditor is no longer entitled to this preferred status.

*Matter of DRW Property Co.*, 57 B.R. 987, 992, 993 (Bankr.N.D.Tex.1986). Indeed, the estate in Chapter 11 has no claim against the partners, at least not via bankruptcy law. *See I–37 Gulf Ltd. Partnership*, 48 B.R. 647, 649 (Bankr.S.D.Tex. 1985); *see also* 5 *Collier on Bankruptcy* ¶ 1111.02[2], p. 1111–22 (15th ed. 1985). What is more, in a Chapter 7 case, while the estate has a claim against the partners, Phoenix' Code-created deficiency claim is no longer part of the estate's liabilities. 11 U.S.C. §§ 723, 1111(b). The legal "nature" of Phoenix' deficiency claim is thus subtly different from that of the trade debt.

In this plan, the debtor "directs" the trade to the general partners, who are anticipated to pay their claims in satisfaction of their liability under the Texas Uniform Partnership Act. The trade are thus being treated somewhat differently, in recognition of their unique legal rights against the partners, rights which a Code-created deficiency claim can not enjoy.

Good business reasons also justify separate treatment, as the partnership and its partners need the trade to maintain good will for future operations. Trade debt simply does not extend credit to an entity such as this based on that entity's long-term ability to pay the debt back, but on the entity's short-term cash flow. If those expectations are frustrated, creditors holding such debt have little recourse but to refrain from doing business with the enterprise. The resulting negative reputation quickly spreads in the trade community, making it difficult to obtain services in the future on any but the most onerous terms. These simple realities of business more than justify separate classification of the trade debt from the obviously unrelated Code-created deficiency claim.

### 3. Classification and "artificial impairment."

■ We are still left with Phoenix' argument that the debtor could have paid the trade in full but left it to the partners instead, so that the debtor would have at least one impaired class to vote for the plan. Is this permitted? The Fifth Circuit's answer seems to be in the affirmative. *Matter of Sun Country Development* opined that taking advantage of the power of cram down is not *ipso facto* bad

faith. 764 F.2d at 408. In that case, the debtor impaired a relatively small class of unsecured claims. The creditor there (as here) complained that there was no independent justification for that impairment other than to "open the gates" to the cramdown provisions.[13] The Fifth Circuit rejected the notion that the debtor's tactic was improper, given that the Code provisions were available and the debtor was simply using them. *Id.* at 408. What is more, nothing in Sections 1123 or 1124 either expressly or impliedly prohibits "intentional" impairment. *See* H.R.Rep. No. 595, 95th Cong, 1st Sess 406, 408 (1977).[14] To the contrary, the only "brake" on impairment appears to be the requirement in Section 1129(b) that the plan not "unfairly discriminate" against a dissenting class of creditors. *In re Meadow Glen, Ltd.,* 87 B.R. 421, 425 (Bankr.W.D.Tex.1988). We turn our attention, then, to that provision.

### 4. Classification and "unfair discrimination."

The argument that the debtor's tactic unfairly discriminates in all cases is not persuasive. *See In re Pine Lake Village Apartment, Co.,* 19 B.R. 819, 831 (Bankr.S. D.N.Y.1982); *In re Northeast Dairy Coop-erative Federation, Inc.,* 73 B.R. 239, 249 (Bankr.N.D.N.Y.1987); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 425 (Bankr.W.D. Tex.1988). The requirement that a plan not "unfairly discriminate" with respect to a dissenting class parallels the requirement that all creditors *within* a given class must be treated the same. Indeed, the phrase is a term of art, with a specialized meaning consistent with the operation of Section 1122(a).[15] In the words of *Collier*'s,

> Reducing discrimination to its bare essentials, a dissident class ... must ... receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.

5 *Collier on Bankruptcy,* ¶ 1129.03[3], p. 1129–50 (15th ed. 1981); *see* H.R.Rep. No. 595, 95th Cong, 1st Sess 416–17 (1977); *see also In re Meadow Glen, Ltd.,* 87 B.R. 421, 425 (Bankr.W.D.Tex.1988). In this case, the debtor has assiduously accorded its trade debt precisely the same dividend as it has its Code-created deficiency claim and, in so doing, has satisfied the technical specifications of Section 1129(b) that the plan not "unfairly discriminate" against the dissenting class.[16] The two classes have the

---

**13.** The case in *Sun Country* was filed prior to the 1984 amendments to the Bankruptcy Code which made explicit a judicial gloss that read in the word "impaired" into the requirement of one accepting class in Section 1129(a)(10). There was thus considerable doubt whether the judicial gloss was justified, in light of the express terms of the pre–1984 version of Section 1129(a)(10), and so some doubt whether the accepting class had to even vote, much less be impaired, due to the operation of Section 1126(f). The debtor's first plan treated the unsecured creditors as unimpaired, but was later amended to give them a short-term note instead of cash on confirmation. Evidence taken by the district court confirmed that the debtor had an independent justification for the impairment, as the notes were subsequently redeemed at a discount after the debtor received its tax refund. The issue of so-called "unjustified" impairment was therefore not directly before the Circuit court.

**14.** ... The plan must designate classes of claims and interests and specify, by class, the claims or interests that are unimpaired under the plan.... The plan must provide the same treatment for each claim or interest of a particular class ...

H.R.Rep. No. 595, *supra* at 406 (discussing § 1123), U.S.Code Cong. & Admin.News 1978, p. 6362.

> This section is new. It is designed to indicate when contractual rights of creditors or interest holders are not materially affected. The section specifies three ways in which the plan may leave a claim or interest unimpaired.

*Id.* at 408 (discussing § 1124), U.S.Code Cong. & Admin.News 1978, p. 6364.

**15.** *Cf.* 11 U.S.C. § 1322(b)(1) (plan may designate a class of unsecured claims as provided in Section 1122, but may not discriminate unfairly against any class so designated). Chapter 13 combines the concept of unfair discrimination with the classification issue, a connection not directly made in Chapter 11 cases.

**16.** The sponsors of the Code remarked that the proscription on unfair discrimination was merely included "for clarity," adding that the provisions of the House Report stated correctly the appropriate interpretation of the phrase as used in this portion of the Bankruptcy Code. 124 Cong Rec H11104 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong Rec S17420 (daily ed., Oct. 6, 1978) (remarks of Sen

same relative legal priority of claim upon the estate's assets and are accorded the same percentage of payment out of those assets.

Phoenix contends that, because the estate has more than enough in cash with which to pay off the trade, there is no just cause for failing to do so, so that the structure of the plan unfairly discriminates. In fact, however, it is the very proscription on unfair discrimination that *mandates* that the trade *not* be paid off, for nothing would then be left of those assets to pay the Code-created deficiency and the plan would *prima facie* "unfairly discriminate" against Phoenix:

> From the perspective of unsecured trade claims, there is no unfair discrimination as long as the total consideration given all other classes of equal rank does not exceed the amount that would result from an exact aliquot distribution.

H.R.Rep. No. 595 at 416, U.S.Code Cong. & Admin.News 1978, p. 6372. *In re Meadow Glen, Ltd.*, 87 B.R. 421, 425 (Bankr.W.D. Tex.1988).[17]

The upshot then is that this plan does not unfairly discriminate against Phoenix' Code-created deficiency claim, nor is the classification scheme inappropriate given the marked legal and economic differences between that claim and the trade debt. The court rejects the notion suggested first in *Meadow Glen* that this plan represents a case of "artificial impairment," as such a conclusion exceeds the intent of Congress in enacting the "unfair discrimination" language. If there is a rational justification for separate classification, the debtor is entitled to exploit the parameters of the Code to get a plan confirmed. This court therefore holds that the plan passes muster

with respect to its classification and treatment of Phoenix' Code-created deficiency claim.

## C. THE *CASE* EXCEPTION

We turn now to whether the plan is "fair and equitable," i.e., whether the plan satisfies the absolute priority rule. *Collier's* has commented gloomily that

> In the real estate limited partnership context, if the partnership's sole asset is a building which does not generate sufficient income to service debt, it is highly unlikely that the debtor can sustain its burden of proof under section 1129(b)(2)(B) that the debtor can provide full payment of the claims of unsecured creditors including the mortgagee's deficiency claims. Once it is clear that the debtor is unable to pay the unsecured deficiency claims in full, the only way that the cram down powers can be successfully used is if the former equity interests are eliminated.

5 *Collier on Bankruptcy*, ¶ 1111.02[2], p. 1111–20 (15th ed.1985).

The debtor argues that all is not lost, however, because the Supreme Court long ago recognized an "exception" to the absolute priority rule, giving it expression in a series of cases culminating in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Phoenix responds that the vitality of the exception under the current Bankruptcy Code was questioned in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and that this court should rule that the exception is no longer available to permit debtors to "buy" their way back in to their own cases.[18] If

---

DeConcini). The House Report, in turn, states that a plan avoids unfair discrimination so long as it provides for "exact aliquot distribution." H.R.Rep. No. 595 at 416, U.S.Code Cong. & Admin.News 1978, p. 6372.

**17.** Phoenix' real frustration is that the plan deprives Phoenix of the veto to which it believes it is entitled by virtue of its large deficiency claim. As we have seen, however, that expectation is unwarranted. Congress gave creditors such as Phoenix the Code-created deficiency claim as an antidote to cram-down, not as a vaccine. The

deficiency claim merely permits Phoenix to invoke the absolute priority rule, forcing the debtor's owners to negotiate a way to satisfy the claim or risk losing their ownership interest.

**18.** In *Ahlers,* Justice White suggested in a footnote that

> our decision should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* exception—a question which has divided the lower courts since passage of the Code in 1978. *Compare, e.g., In re Saw-*

it is indeed no longer available, then this plan (and virtually all real estate bankruptcy cases in this part of Texas) must fail as a matter of law. If it survives, then the facts of this case must be tested against the exception to see if this case fits. If this case does not, then this case fails but others may follow with greater success.

### 1. The history and development of the "exception"

*Case* advised that a junior interest holder might retain an interest in the enterprise even though senior classes were not fully paid provided the junior interest holder had made a cash infusion which was both *necessary* under the circumstances and *substantial*. *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 84 L.Ed. 110, 122 (1939).[19] Case law had developed that promulgated a "fixed principle" that plans must be "fair and equitable," i.e., that equity reorganizations were required to adhere to an absolute priority in their payment scheme, enforceable as a matter of law by the court, regardless whether anyone else objected.

> [T]he stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors.... [A]ny arrangement of the parties by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.

*Louisville Trust Co. v. Louisville, N.A. & C.R. Co.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899); *see Northern P.R. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926). This "fixed principle" was incorporated into

Section 77B of the Bankruptcy Act by the inclusion of a requirement that plans be "fair and equitable," the term of art for the absolute priority rule. *Case, supra*, 308 U.S. at 119, 60 S.Ct. at 9.

However, early cases also recognized that, due to practical considerations, the rule had to have an exception. In *Kansas City Terminal, supra*, the Court had noted that

> [W]hen necessary, [creditors] may be protected through other arrangements which distinctly recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation, and afford each of them fair opportunity, measured by the existing circumstances, to avail himself of this right.

> . . . . .

> Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases, the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.

*Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. at 454–55, 46 S.Ct. at 551–52. But for this exception, a perfectly sensible reorganization might founder for lack of capital infusion from the equity holders, who could hardly be expected to pump new money into a venture if they could not in the process retain an interest in the venture.

*Case* acknowledged the continuing vitality of the court-fashioned exception to the absolute priority rule:

---

*mill Hydraulics, Inc.*, 72 BR 454, 456, and n. 1 (Bkrtcy CD Ill 1987) *with, e.g., In re Pine Village Apartment Co.*, 19 BR 819, 833 (Bkrtcy SDNY 1982). Rather, we simply conclude that even if an "infusion-of-'money-or-money's-worth'" exception to the absolute priority rule has survived the enactment of § 1129(b), respondents' proposed contribution to the reorganization plan is inadequate to gain the benefit of this exception.

*Id.* at 485 U.S. at —— n. 3, 108 S.Ct. at 966–67 n. 3, 99 L.Ed.2d at 177 n. 3.

**19.** The actual cash infusion in *Case* was rejected because it failed the second prong of the test. *Id.* 308 U.S. at 121–22, 60 S.Ct. at 11, 84 L.Ed. at 123. First and foremost, the capital infusion was not cash. Second, the consideration retained by the stockholders was disproportionate relative to the infusion.

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... Especially in [*Kansas City Terminal*] did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.

*Case v. Los Angeles Lumber Products Co.,* 308 U.S. at 121, 60 S.Ct. at 10. For the exception to lie, the circumstances of the case must first *dictate* the necessity of a capital infusion. Then, the participation given in return for the infusion must be "reasonably equivalent." The exception was thus carefully cabined, lest the absolute priority rule itself be eviscerated.

The Court went on to underscore the underlying importance of preserving the creditors' "full right of priority against the corporate assets," however:

If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders. To the extent of the inadequacy of their contributions the stockholders would be ... "in the position of mortgagor buying at his own sale."

In view of these considerations, we believe that to accord "the creditor his full right of priority against the corporate assets" where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in moneys' worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

*Case, supra* at 122, 60 S.Ct. at 10. *Case* thus reaffirms the paramount importance of preserving absolute priority, even though a new capital infusion might be required for the plan's success. The "exception" was thus carefully circumscribed.

### 2. *The continuing vitality of the "exception"*

*Ahlers*'s inference that *Case* did not survive the enactment of the Bankruptcy Code can probably be traced to the Code's fundamental change in structure from the Bankruptcy Act. Under the Act, courts were required to enforce the absolute priority rule as a matter of law in Chapter X reorganizations. 11 U.S.C. (repealed) § 621(2) (1976). The Code, by contrast, permits consensual plans which need not comport with absolute priority, i.e., senior debt may voluntarily surrender rights to recovery out of the estate's assets to junior debt holders. 11 U.S.C. § 1129(a)(7), (8). Absolute priority is preserved as a prerequisite to confirmation only in the narrow circumstance of "cram-down," or confirmation over the objection of a dissenting class of creditors, and then only from the dissenting class down. 11 U.S.C. § 1129(b)(2)(B); H.R.Rep. No. 595, 95th Cong, 1st Sess 413 (1977). The retention of the "fair and equitable" standard in cram down situations serves the equitable end that a creditor class should only be forced to accept a plan over its objection upon assurance that it will not, in the process, be forced to surrender its rights to satisfaction of its claims out of the assets of the estate to junior interests. To reiterate the Supreme Court in *Boyd*, it would be neither fair nor equitable to visit such a result on classes of creditors whose claim on the assets of the enterprise is clearly superior. *Northern P.R. Co. v. Boyd,* 228 U.S. at 503, 33 S.Ct. at 559.

The *Case* exception does not undercut the protective equitable function of the absolute priority rule even as resurrected in Section 1129(b) of the Code. In fact, it is probably a misnomer to call it an exception at all. It is, rather and more accurately, a logical expansion on the notion that an equity reorganization should, in all respects, be "fair" and "equitable." The *Case* court quoted with approval an earlier bankruptcy case to that very effect:

Circumstances may exist where the success of an undertaking requires that new money be furnished and where the former stockholders are the only or most feasible source of the new capital. In such instances, the court may recognize *as fair and equitable* a plan which in-

cludes contributions of new money by stockholders, provided it satisfactorily appears that full recognition has been given to the value of the creditors' claims against the property.

*In re Dutch Woodcraft Shops*, 14 F.Supp 467, 471, 30 Am.Bankr.Rep. 351 (D.C.Mich. 1935) (emphasis added), *quoted at Case, supra* at 308 U.S. 121 n. 15, 60 S.Ct. at 10 n. 15. An infusion of new capital may well be necessary to the success of the venture. To the extent that it is, and to the extent that persons willing to invest in the reorganized entity receive a participation in the enterprise commensurate with their investment, and no more, it cannot be said that the participation granted the investor renders the plan either unfair or inequitable. *Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. 445, 455, 46 S.Ct. 549, 70 L.Ed. 1028 (1926); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10–11, 84 L.Ed. 110, 122–23 (1939). There is nothing about the structure of the Code that alters this fundamental recognition of the practicalities of all enterprises. It still takes cash to run any enterprise and the cash flow of the enterprise is frequently inadequate to the task. The same equitable considerations that motivated the recognition of the "exception" in *Kansas City Terminal*, and reaffirmed its vitality under Section 77B in *Case*, commend its preservation under the Bankruptcy Code, to assure that an overstrict application of the "fair and equitable" standard does not strangle the debtor and leave the reorganization stillborn.

This court thus holds that, notwithstanding the precautionary note in *Ahlers*, the *Case* "exception" is still good law, as it represents nothing more than an extension of the fair and equitable concept to embrace the need for new capital for the

venture. To the extent the "fair and equitable" concept has been brought forward into the Code, therefore, so also has the expansion on that concept enunciated in *Case*. There is nothing peculiar about real estate reorganization cases that suggest that the need for new capital in such cases is any less compelling than in any other venture, so *Case* should be available in such cases, provided it is precisely applied.[20]

### 3. *Applying the "exception"*

When applying *Case* under the Bankruptcy Code, a court should first be sensitive to its antecedents. The exception serves the narrow purpose of affording the debtor the capital necessary to survive. It is not intended as a device by which pre-filing owners can buy their way back into the venture, much less preserve their ownership interest. Such a read would amount to a perversion of what Justice Douglas clearly intended to be a limited and narrow extension. Close attention must be paid not only to the letter of the exception but also to the spirit in which it was promulgated. Requiring a rigorous showing of both necessity and substantiality will assure that a debtor's equity holders will not eviscerate the absolute priority rule by means of gratuitous, token cash infusions proposed primarily to "buy" cheap financing. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 570, 63 S.Ct. 727, 751, 87 L.Ed. 959, 1010 (1943).

If a cash infusion is not necessary to the reorganization effort, the debtor will have failed to have raised the predicate equitable concern that motivated resort to the exception in *Kansas City Terminal* and *Case* in the first place and the court should not allow the capital infusion and concomitant equity participation without the consent of

---

**20.** It is fair to assume that Congress was aware of *Case* when it passed the Bankruptcy Code. That Congress did not expressly codify *Case*'s holding should be of no moment, as the term of art carried with it the judicial glosses that had been placed upon it. What does matter is that the Bankruptcy Code did not expressly repudiate *Case*. It is a time-honored principle of statutory construction that legislators are presumed

to be aware of judicial glosses placed on prior statutory enactments, and that subsequent amendments and codifications are presumed to have been carried into the new statute unless expressly repudiated. The Bankruptcy Code did not repudiate *Case*, so the long-standing equitable expansion of the absolute priority rule should be presumed to still be good law.

the senior interests. We only entertain the *Case* extension to the absolute priority rule in those situations in which the enterprise *needs* the capital investment in the first place. Otherwise, the general concerns that animate the "fair and equitable" standard still predominate and prohibit use of the extension merely as a device to retain an interest in the venture.

If (and only if) the cash infusion *is* needed, it must be actual money or money's worth, paid not merely promised, and the participation accorded the equity interests in exchange for this cash infusion must be commensurate, reasonably equivalent. The equity interests will be allowed back into the venture only to the extent of their new contribution, in order to preserve creditors' full rights of priority in the estate's assets:

> Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances.

*Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. at 456, 46 S.Ct. at 552; *Northern P.R. Co. v. Boyd*, 228 U.S. at 504, 33 S.Ct. at 560.

With these preliminary considerations in mind, we turn to the facts and posture of this case.

### a. The "necessity" prong

The debtor has enough cash to pay off all trade debt in full, but not the deficiency claim. Because of the strictures of Section 1129(b), which prohibit "unfair discrimination," the debtor cannot pay off the trade debt without jeopardizing the entire plan in the process. The debtor needs cash to pay the deficiency claim as well as the trade, in accordance with plan terms. In answer to this need, the debtor's general partners propose to put in $500,000 in additional cash, some of which will be used to pay the debtor's portion of the trade, some of which will pay precisely the same percent-

age to Phoenix on its deficiency claim.[21] The debtor contends that the cash infusion is both necessary and substantial as those terms are used in *Case,* so that the plan should be found to be fair and equitable despite its technical noncompliance with Section 1129(b)(2)(B).

The office complex is well managed, with a good occupancy. The net operating income is close to, but not quite, sufficient to service the plan's debt. While the building is relatively new, it can anticipate a certain amount of maintenance in the future. The cash flow analyses of both appraisal experts as well as the projections of the debtor confirm that, eventually, the debtor's anticipated cash flow will be insufficient to satisfy both debt service and the escrows needed for taxes and insurance. The total infusion of cash by the partners will cover these shortages and future needs, and will also pay off the claims of all but one class. Without this cash, the plan would not be feasible. *See* 11 U.S.C. § 1129(a)(11); *see also In re Murel Holding*, 75 F.2d 941 (2d Cir.1935) (setting the standard for adequate protection of a secured creditor's interest in collateral over the life of a plan at "indubitable equivalence").

The cash will come from the current owners of the partnership, for which they are to receive 100% of the ownership interest in the venture. In the current economic climate, with banking institutions chastened by the extraordinary number of bank failures over the last five years, even well-run commercial real estate ventures should not expect to find working capital available from banks or savings and loan associations. Phoenix' own witness testified that there is no financing currently available for commercial properties in Texas, and the debtor's general partner confirmed that it has not been able to attract new equity outside of its existing partners, both general and limited.

Phoenix has indicated that it would be happy to advance $155,000 to pay off the unsecured creditors and complete tenant

---

**21.** *Case* recognized that new money was commonly necessary in equity reorganizations not only to provide new working capital but also to pay dissenting creditors. *Case, supra* at 308 U.S. 121 n. 15, 60 S.Ct. at 10 n. 15.

finish out obligations. It has not, however, indicated any willingness to fund future operations unless it can take over ownership of the property, a condition precedent inimical to the reorganization. It therefore does not represent a viable alternative source of *working capital* for the future of the entity.[22]

The proposed capital infusion from the existing owners of the partnership is, in this court's view, "essential to the success of the undertaking," and so satisfies the "necessity" predicate for the invocation of the capital infusion exception to the absolute priority rule. *Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. at 455, 46 S.Ct. at 551–52; *Case v. Los Angeles Lumber Products Co.*, 308 U.S. at 121, 60 S.Ct. at 10.

### b. The "substantiality" prong

We turn, then, to the question of substantiality. As noted above, this part of the *Case* extension has two facets.

First, the contribution must be "substantial" in the sense that it must be "money or money's worth." Items such as reputation, standing in the community, financial wherewithal, and management expertise, while perhaps important to the question of a plan's feasibility, have no place whatsoever in the calculus for what constitutes a "substantial contribution." *Case, supra,* 308 U.S. at 122, 60 S.Ct. at 10, *Ahlers, supra,* 485 U.S. at —— n. 3, 108 S.Ct. at 966–67 n. 3, 99 L.Ed.2d at 177 n. 3.

Second, the participation or consideration accorded to those making the capital infusion must be commensurate with or reasonably equivalent to the capital infusion, to discourage current owners from buying up the venture for a relatively modest investment and to preserve the absolute priority rule. The essence of the absolute priority rule is that creditors have a prior right to the corporate assets which may not be undermined even in the interests of furthering the reorganization. Once bankruptcy is filed, the role of the equity interests in the continuation of the enterprise is fundamentally altered. In the words of the Court in *Case,* the equity interest owner, upon filing,

> ... invokes that jurisdiction risking all of the disadvantages which may flow to him as a consequence, as well as gaining all of the benefits. One of those disadvantages from the viewpoint of the debtor and its stockholders is the approval of a plan of reorganization which eliminates them completely.

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. at 127, 60 S.Ct. at 12.

In this case, the debtor proposes to retain 100% of the ownership of the enterprise with a new equity infusion of $500,000. Is the proposed participation reasonably equivalent to the capital contribution? The question contains within itself a preliminary issue, how to measure "reasonable equivalence." The Supreme Court in *Northern P.R. Co. v. Boyd*, in evaluating whether existing equity might retain an interest in a railroad, commented that

> If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event, it was a *right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatsoever.*

*Northern P.R. Co. v. Boyd*, 228 U.S. 482, 508, 33 S.Ct. 554, 561, 57 L.Ed. 931 (1913) (emphasis added). Again, the Supreme

---

**22.** It is important to emphasize that, due to the nature of the *Case* capital infusion exception, it is inappropriate to approach the problem as though the ownership of the enterprise were up for sale. That is simply not the issue at all. Instead, the question is whether there is an available source of capital to fund the plan. By the time one gets to the *Case* extension, one is already *beyond* whether the plan itself is otherwise proper. In other words, the issue of where to get the cash to make the plan work is not an opportunity to undermine the plan. Instead, if the plan *fails,* then another party in the case with standing may propose an alternative plan. At confirmation, the court is not at liberty to "conduct an auction" of the equity. The court's limited role is to decide whether the plan as proposed should or should not be confirmed. The consequences of that decision are for the parties to work out, not the court.

Court in *Kansas City Terminal* reiterated that

> when necessary, [creditors] may be protected through other arrangements which distinctly recognize *their equitable right to be preferred to stockholders* against the full value of all property belonging to the debtor corporation, and *afford each of them fair opportunity*, measured by the existing circumstances, *to avail himself of this right.*

*Kansas City Terminal R. Co. v. Central Union Trust Co.*, 271 U.S. at 454–55, 46 S.Ct. at 551–52 (emphasis added). Finally, the Supreme Court in *Ahlers* has recently reaffirmed that equity ownership has value, independent of the fair market value of the enterprise, for purposes of applying the absolute priority rule:

> We join with the overwhelming consensus of authority which has rejected this "no value" theory. *Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property."* ... Indeed, even in a sole proprietorship, where "going concern" value may be minimal, *there may still be some value in the control of the enterprise;* obviously, also at issue is the interest in potential future profits of a now-insolvent business. And while the Code itself does not define what "property" means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad. "'[P]roperty' includes both tangible and intangible property." See H.R.Rep. No. 595 at 413.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, ——, 108 S.Ct. 963, 969, 99 L.Ed.2d 169, 180 (1988) (emphasis added). We thus see that, in terms of the absolute priority rule, the enterprise first "belongs" to its unsecured creditors.[23]

By the same token, the capital infusion concept is grounded on the assumption that any investor, even a former owner, is entitled to compensation in exchange for investing new capital into the venture. *Case v. Los Angeles Lumber Products Co.*, *supra*, 308 U.S. at 123, 60 S.Ct. at 11; *In re U.S. Truck Co.*, 800 F.2d 581, 588 (6th Cir.1986); *In re Potter Material Service, Inc.*, 781 F.2d 99, 103 (7th Cir.1986); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 148 (Bankr.S.D.N.Y.1984); *In re Jartran, Inc.*, 44 B.R. 331, 367 *et seq.* (Bankr. N.D.Ill.1984). Many of these cases, including *U.S. Truck*, *Potter Material Service*, and *Jartran*, emphasize the risk associated with the investment, thereby justifying allowing a 100% ownership interest in exchange for a relatively modest capital infusion.[24]

The true balance needs to be struck between a recognition of this risk/reward analysis on the one hand and the creditors' entitlement to control over the venture by virtue of the operation absolute priority rule. Cases such as *Jartran*, *U.S. Truck*, and *Potter Material Service* do not give sufficient ear to the overriding function of the absolute priority rule, which is to assure that, to paraphrase *Boyd*, to the extent that the value of a given venture justifies the issuance of new equity in exchange for new capital, the creditors are entitled to the benefit of that value, whether it is present or prospective, for dividends or only for purposes of control. This is why

---

**23.** Under the absolute priority rule as articulated in *Case*, claimants were entitled to have their relative values respected in full, according exactly to their nonbankruptcy entitlements. The fact that there was a going-concern surplus to the assets as a whole was irrelevant. This represented part of the value of the debtor's assets that the creditors had a right to over shareholders outside bankruptcy, and the absolute priority rule respected that right inside of bankruptcy.

Jackson, "Reconsidering Reorganization," *The Logic and Limits of Bankruptcy Law*, 213 (Harvard University Press 1986).

**24.** The *Jartran* case takes this concept to its logical (and perhaps impermissible) extreme, noting that, where a company is insolvent, any equity infusion at all will entitle the investor *ipso facto* to 100% of the equity of the company. *In re Jartran, Inc.*, 44 B.R. at 379 ("inasmuch as the shareholders' equity is valueless, any contribution by Hall will necessarily be equal to or greater than the value of its 100% ownership interest").

the participation accorded the investor must be "reasonably equivalent." *Case v. Los Angeles Lumber Products Co.,* 308 U.S. at 122, 60 S.Ct. at 10. A court applying *Case* must evaluate not only the value of the equity in the enterprise being acquired by way of the capital infusion but also the "value" of senior rights threatened by the capital infusion. Note the comment of the Supreme Court in *Consolidated Rock Products* regarding how senior interests ought to be compensated in the face of a retention of values by junior interests:

> Thus, it is plain that while creditors may be given inferior grades of securities, their "superior rights" must be recognized.... They must receive ... compensation for the senior rights they are to surrender. If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of stockholders without compensation. That is not permissible.

*Consolidated Rock Products, Co. v. Du-Bois,* 312 U.S. 510, 528–29, 61 S.Ct. 675, 686, 85 L.Ed. 982, 995 (1941).

In order to evaluate whether the participation proposed to be afforded the equity investor is commensurate with the capital infusion, the bankruptcy court must be prepared to value all aspects of the enterprise. In some cases that will prove easier than in others. *Compare In re Potter Material Service, Inc.,* 781 F.2d at 103 *with In re Jartran, Inc.,* 44 B.R. at 367–79. These courts and others have adopted as their starting point *Consolidated Rock Products, Co. v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). The Supreme Court there held that a "capitalization of prospective earnings" was essential in order to evaluate the relative distribution of property proposed:

> The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance. A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate.

*Id.,* 312 U.S. at 526, 61 S.Ct. at 685, 85 L.Ed. at 993–94.

Neither party presented any direct evidence on capitalized future net revenues, but the appraisals of both parties reflect, *inter alia,* a discounted cash flow analysis that supports the valuations of the allowed secured claim. Nothing remains in excess of that claim, apart from the $101,000 currently on hand, and the $500,000 to be invested. The debtor's general partner stated he did not expect a return on the investment, so much as a mitigation of the some one million dollars already invested in the project. He does not anticipate recovering $5.8 million (the amount of the allowed secured claim in the plan) in the near term, but believes that eventually, the market will recover and with it, the value of this property. Based upon projected revenues, it is not likely that the investors will recover on their investment for the ten year term of the plan.

Looking at the valuation of the enterprise itself as a going concern, relying on the discounted cash flows even of Phoenix' expert, the court finds that the investment justifies a 100% ownership of the enterprise, all other things being equal. *See In re Potter Material Service, Inc.,* 781 F.2d 99, 103 (7th Cir.1986); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 148 (Bankr. S.D.N.Y.1984). The debtor's investors as a group are essentially "buying" the future risk of return, postponed in this case for ten years, for $500,000. Leaving that much money at risk for that long, in exchange for 100% of the reward at the end of that term is not at all unreasonable and full ownership under the circumstances is

therefore justified given the long-term deferral of any reward for the investment relative to the risk of loss being shouldered.

We turn next to whether the senior interests will receive "compensatory treatment" consistent with the absolute priority rule. We must first decide just what senior rights, if any, are being "taken" by virtue of this proposed capital infusion. In this case, the "senior right" in question is the *Ahlers*-acknowledged right of an unsecured creditor class not being paid in full to control the enterprise to the exclusion of current ownership, a right otherwise conferred on Phoenix by operation of Section 1111(b), which gave Phoenix an unsecured claim entitled to control to the exclusion of junior interests under Section 1129(b)(2)(B).

It is not an easy task to evaluate the relative value of Phoenix' "loss of control" occasioned by the proposed capital infusion.[25] It is not even certain whether the value can be quantified, or that, if it can be, whether it need be compensated with money. Compensation "will be dependent on the facts and requirements of each case." *Consolidated Rock Products, Co. v. DuBois,* 312 U.S. at 529–30, 61 S.Ct. at 686–87, 85 L.Ed. at 995.[26] Special note should be made in this case that the senior right which occupies the court here arises only in bankruptcy. 11 U.S.C. § 1111(b); *see* discussion *supra.* It is not as though this creditor had contracted for a deficiency claim prior to bankruptcy. It only has a Code-created deficiency to assure it of a voice in the proceeding.

Nonetheless, the Code-created deficiency must be given equal voice and dignity with nonbankruptcy recourse claims, in order to honor the intent of Congress in enacting Section 1111(b) in the first place. Nonrecourse debt is treated as recourse, for purposes of bankruptcy, precisely in order to trigger the operation of the absolute priority rule. 124 Cong Rec H11103–11104, 95th Cong, 2d Sess (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). No distinction should thus be drawn when evaluating the value of the particular senior right conferred by way of Section 1111(b), namely, control over the enterprise to the exclusion of equity interests.

Here, the holder of this deficiency claim could either prevent confirmation or at the least would enjoy whatever upside gain the enterprise might enjoy should the market in Austin return to health, but for the capital infusion. Phoenix' unsecured claim would, in the absence of the cash infusion, give it a measure of control over the very building which also stands as collateral for its secured debt. These are valuable rights indeed, though they are difficult to quantify.[27] On the other hand, Phoenix would not have the capital infusion proposed under this plan and the enterprise itself would be $500,000 poorer without it, but for the equity infusion.

In order to compensate Phoenix, the debtor may have to confer certain offsetting rights, such as an ownership participation, an option to purchase, or some other such device "dependent on the facts and requirements of each case." *Consolidated Rock Products, Co. v. DuBois,* 312 U.S. at 529–30, 61 S.Ct. at 686–87, 85 L.Ed. 995. On the other hand, the facts of a given case may well satisfy the need for full compensation without further adjust-

25. Recall that *Ahlers* stated that
[i]ndeed, even in a sole proprietorship, where 'going concern' value may be minimal, there may still be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business.
*Norwest Bank Worthington v. Ahlers,* 485 U.S. at ——, 108 S.Ct. at 969, 99 L.Ed.2d at 180.

26. The Court observed that the mechanism to be employed "in the case of a solvent company ... will be dependent on the facts and requirements of each case." *Id.* There is no logical reason for the rule to be any different in the case of an

insolvent entity into which current equity intends to infuse new capital in exchange for an ownership interest which will, by definition, deprive the senior unsecured creditors of some or all of their control over the venture. *See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific RailRoad Co.,* 318 U.S. 523, 570, 63 S.Ct. 727, 751, 87 L.Ed. 959, 1010 (1943).

27. The evidence at trial strongly suggests that the lender does not know what's good for it, as the value of the property is likely to deteriorate in the hands of the lender, based upon its past history with other properties it has re-acquired.

ment. In this case, for example, current management is deemed by all to be superior, the plan's duration is relatively short, and all of the capital contributed goes into the operation and maintenance of the very asset which secures Phoenix' secured claim. Under these circumstances, it is difficult to find that the rights which Phoenix enjoys by virtue of its Code-created deficiency require further compensation than they already have, in deference to Justice Douglas' advise that

> [p]ractical adjustments are necessary. The method of effecting full compensation for senior claimants will vary from case to case.

*Consolidated Rock Products, Co. v. DuBois,* 312 U.S. at 529–30, 61 S.Ct. at 686–87, 85 L.Ed. at 995.[28] For these reasons, the court believes the proposed plan should be approved as it stands.

### III. CONCLUSION

For all of the foregoing reasons, the court finds and concludes that the debtor's plan as currently proposed should be approved and confirmed. An order consistent with this opinion will be entered.

So ORDERED.

---

**28.** In another case, a court might require further provisions on the lines of equity participations, back-in ownerships, profit participations, or the like.