**In re William Elmer DOWDEN, Mary Ladell Lindsey Dowden, aka/dba Dowden Ranch, Debtors.**

**Bankruptcy No. 89BK–80071–A11.**

United States Bankruptcy Court, W.D. Louisiana, Alexandria Division.

Nov. 14, 1989.

This is a core proceeding pursuant to 28 U.S.C. Section 157(L) inasmuch as it deals with confirmation of plans. The Court has jurisdiction under 28 U.S.C. Section 1334 and by the general reference to the Bankruptcy Court by the District Court under Local District Court Rule 22 incorporated into Local Bankruptcy Rule 1.2. No party has sought to withdraw the reference to the Bankruptcy Court, nor has the District Court done so on its own motion. This Court makes the following Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The question before this Court is one of first impression in this Division and concerns the continued viability of the exception to the "absolute priority" rule (11 U.S.C. Section 1129(b)(2)(B)(ii)), which exception has been described as the "new value" or "money or money's worth" exception as it was articulated in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). FLB opposes the debtors' plan, asserting that the absolute priority rule prohibits its confirmation. This opinion must also deal with the issue of whether the above-mentioned exception survived the enactment of the Bankruptcy Code and/or the holding of the Supreme Court in *Norwest Bank of Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

Debtors, William Elmer Dowden and Mary Ladell Dowden ("debtors"), operate a business known as the Dowden Ranch near Natchitoches, Louisiana. The operation is conducted over a total of 1580 acres, 843 of which are mortgaged to FLB. It is conceded by all parties that debtors are ineligible for chapter 12 relief. The ranching operations presently consist solely of raising cattle for sale. Wheat is raised only for feeding the livestock. Previous efforts to grow row crops on the ranch were unsuccessful due to large parts of the land flooding every year.

### REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter came before the Court on November 1, 1989, on the hearing on confirmation of debtors' plan of reorganization ("the plan") filed May 10, 1989. Objections to confirmation were filed by the Federal Land Bank of Jackson in Receivership ("FLB") and by the United States Trustee. The latter's objection was withdrawn at the hearing.

In pertinent part, the debtors' Plan of Reorganization proposes to treat six classes as follows:

| CLASS | NATURE | PROPOSED TREATMENT |
|---|---|---|
| Class 1 | Administrative Expenses | Deemed impaired, to be paid in full prior to or at confirmation. |
| Class 2 | Tax Priorities | Debtors assert there are no such claims. |
| Class 3 | Farmers Home Administration | Second mortgage on real estate (subject to FLB's first mortgage) to be canceled. Cattle loan and mortgage treated as completely secured and reamortized. Balance of claims relegated to class 6. |
| Class 4 | FLB | Debtors to surrender stock/participation certificates, pay $279,500 for secured claim; balance of claim relegated to class 6. |
| Class 5 | City Bank of Natchitoches | Mortgage on debtors' residence to be paid in accordance with a settlement with this creditor in prior chapter 11 proceedings. Unsecured claim of $138,000 treated in class 6. |
| Class 6 | Unsecured Creditors | Summarized _infra_. |

The ballot summary introduced at the hearing on confirmation reads as follows:

| | AMOUNT | BALLOT |
|---|---|---|
| Class 1 — Administrative Priorities | $ 0.00 | None |
| Class 2 — Tax Priorities | $ 0.00 | None |
| Class 3 — FmHA | $ 78,250.00 | None |
| Class 4 — FLBJ [1] | $279,500.00 | Reject |
| Class 5 — City Bank & Trust | $125,000.00 | Accept |
| Class 6 — Unsecured | | |
| i) City Bank & Trust | $138,000.00 | Accept |
| ii) FmHA | $294,250.00 | None |
| iii) FLBJ | $790,180.64 | Reject |
| iv) John Deere [2] | $ 72,989.08 | Accept |

Classes Accepting: Two — City Bank & Trust Company John Deere Company

Classes Rejecting: Two — FLBJ (secured and unsecured)
Classes Not Voting: Three

---

1. The value shown is the same as drawn in debtors' plan and was fixed by valuation hearing on October 18, 1989. See Order dated October 26, 1989.

2. Debtors objected to the claim of John Deere Company. The matter was compromised and the claim fixed as unsecured for confirmation purposes pursuant to a hearing on October 18, 1989. See Order dated October 26, 1989.

Debtors' plan proposes that "[a]fter confirmation, title to debtors' property will revert to the debtors." Article III, Miscellaneous Provisions, Number 7.

The treatment proposed for the unsecured creditors is as follows:

"The debtor, William Dowden, is the owner and named insured in a Flexible Premium Adjustable Life Insurance Policy issued by New England Mutual Life Insurance Company, Policy Number OUO73002, in the face amount of $500,000.00 issued on February 28, 1985. The anniversary date of the policy is February 28, and attached to this plan is the year-end statement for 1988–89 showing the current status of the policy. The annual premium is $11,000.00, and the monthly premium is $965.00.

Under the terms of the policy, the debtor is entitled to convey ownership of it (or any part of it) to any entity, and the only restriction is that any transferee must receive at least a policy with a $50,000.00 face value. Any ownership in excess of that amount can be in any additional amount.

This policy is an exempt asset of the debtors and it is not property of the estate. The exemption is provided in LRS 22:647. The insured will be 66 years old on September 1, 1989, and he would have a life expectancy of 10.54 years on that date. However, the debtor has undergone treatment (and surgery) for throat cancer within the last three (3) years, thereby reducing his life expectancy.

Debtors propose to satisfy this class of creditors by conveying to each of them which choose to participate a portion of the life insurance policy described above in proportion to the claim of each with a minimum of $50,000.00 coverage. The members of this class will have to elect on/before the confirmation hearing (or at some other time designated by the Court) whether they intend to participate in this distribution.

Each creditor receiving an assignment shall be responsible for paying the premium charge which is incurred for the amount of the insurance so conveyed. As soon as the Order of Confirmation becomes final herein, the debtor shall apply for the change of ownership established at confirmation. The Order of Confirmation shall specify the intended ownership.

If no election is made by a creditor in this class, that creditor shall receive no participation in the policy.

The debtors consider this distribution to constitute 'money or money's worth' as defined and discussed in *Case vs Los Angeles Lumber Products Company*, 308 U.S. 106 [60 S.Ct. 1, 84 L.Ed. 110] (1938), as construed by *Northwest [Norwest] Bank Worthington vs. Ahlers*, [485 U.S. 197] 108 S.Ct. 5798 [963], [99] L.Ed.2d 21 [169]."

The Code provides that a class of claims has accepted a plan if the creditors of such class, holding one-half in number and two-thirds in amount, have voted to accept the plan. 11 U.S.C. Section 1126. Class 6 has thus not accepted the plan.

The debtors concede by the very terms of their plan that FLB and the other class 6 creditors are impaired under the plan. The plan cannot be confirmed over the objection of an impaired class unless the debtors can successfully invoke the cramdown provision of Section 1129(b). Since debtors here seek to retain their assets without paying the unsecured creditors the full amount of their allowed claims, the debtors' plan on its face does not meet the absolute priority rule, which is summarized as follows:

"The absolute priority rule, in its simplest terms, requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests—such as those of equity holders—may share in the assets of the reorganized entity."

**392**

*The New Value Exception to the Absolute Priority Rule: Is Ahlers .the Beginning of the End?*, 93 Com.L.J. 303, No. 3 (Fall, 1988).

■ The viability of the new value exception to the absolute priority rule has been extensively argued in these proceedings in briefs of both FLB and debtor. Further, it has been the subject of extensive scholarly debate, as in the above-cited article. For the purpose of this opinion, this Court after careful consideration adopts the conclusions reached regarding the matter in *In re Greystone III Joint Venture*, 102 B.R. 560 (Bkrtcy.W.D.Tex. 1989).

The *Greystone* Court, after an excellent and extensive discussion, concluded:

"[T]he *Case* 'exception' is still good law, as it represents nothing more than an extension of the fair and equitable concept to embrace the need for new capital for the venture. To the extent the "fair and equitable" concept has been brought forward into the Code, therefore, so also has the expansion on that concept enunciated in *Case*. There is nothing peculiar about real estate reorganization cases that suggest (sic) that the need for new capital in such cases is any less compelling than in any other venture, so *Case* should be available in such cases, provided it is precisely applied." *In re Greystone, supra* page 575, (footnote omitted). *See* also *Matter of Yasparro*, 100 B.R. 91 (Bkrtcy.M.D.Fla.1989).

It is now to the more difficult test of applying the exception that this opinion now turns. We must first review the purpose of the exception.

As noted in *Greystone, supra:*

"The exception serves the narrow purpose of affording the debtor the capital necessary to survive. It is not intended as a device by which pre-filing owners can buy their way back into the venture, much less preserve their ownership interest....

If a cash infusion is not necessary to the reorganization effort, the debtor will have failed to have raised the predicate equitable concern that motivated resort to the exception in *Kansas City Terminal [Railway Company v. Central Union Trust Company* of New York; 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1925)] and *Case* in the first place and the Court should not allow the capital infusion and concomitant equity participation without the consent of the senior interests. We only entertain the *Case* extension to the absolute priority rule in those situations in which the enterprise *needs* the capital investment in the first place. Otherwise, the general concerns that animate the 'fair and equitable' standard still pre-dominate and prohibit use of the extension merely as a device to retain an interest in the venture."
*Greystone, supra* pages 575–576.

Thus, it would seem that the first prong of the test is the necessity for the capital infusion. In *Greystone*, the court found that the debtor needed a cash infusion to satisfy the trade debt.

■ Here, debtor (Mr. Dowden) testified that he needs to retain ownership of the property to continue the cattle operations. Counsel for FLB asserts, however, that the contribution is not being made to the reorganized entity. This assertion raises the difficulty of an individual (as opposed to corporate) debtor successfully invoking the exception. This difficulty will be discussed more fully *infra*, but it appears that the debtors here have failed to correlate the proposed contribution to anything more than the desire to obtain an ownership interest, rather than demonstrate the need for the infusion to the "reorganization effort." *Greystone, supra.*

There is no demonstrated correlation between the contribution and the debtors' cattle operation, such as the desire to use same to pay trade debt, current farm expenses, purchase equipment or pay farm laborers. Here, the debtors propose the contribution for the sole purpose of retaining ownership, a sort of "I think therefore I am" analysis that flies in the teeth of the exception to the absolute priority rule.

Although these reasons for decision could deny confirmation at this juncture,

considerations of equity and other jurisprudence compel this Court to further examine debtors' proposal. For example, the Seventh Circuit's decision in *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir. 1986) gives scant attention to the necessity element, other than to suggest that necessity was "implicit" in the bankruptcy court's conclusion that the plan there was fair and equitable. *See Potter*, 781 F.2d at 102, and the discussion in 93 Com. L.J., *supra*, at page 313.

Once a court has determined (which these reasons assume for the limited purpose of the following discussion) that debtor has demonstrated the enterprise's need for the contribution, the contribution itself must be closely scrutinized.

In *In re Potter Material Service, Inc.*, *supra*, the Seventh Circuit formulated a two-part test as follows:

(1) The investment must represent a substantial contribution

(2) Which must equal or exceed the value of the retained interests.

This opinion will first deal with the second prong of the *Potter* test. Here, debtors again encounter the difficulty of an individual (as opposed to corporate) debtor qualifying for the exception, due to the very nature of the differences in the beasts. This dilemma is ably summarized as follows:

"The individual Chapter 11 debtor's task is more complex in contributing capital which is reasonably equivalent in value to the interest retained by this debtor. It is the major hurdle in seeking cramdown. The individual debtor cannot recast his interest in property the way corporate shareholders can recast their shares. Pragmatically, without a benevolent parent or guardian or 100% payment to the unsecured creditors, the individual debtor is always left in the precarious position of determining how much property to liquidate in order to save the remainder. The individual debtor's dilemma is caused by *Los Angeles Lumber's* direction of the 'infusion of any capital' exception to the corporate entity without considering how the exception would affect individuals. The value of the shareholders' retained interest will change drastically depending upon the value of the unsecured claims. The value of the individual or sole proprietor's property, on the other hand, is not effected (sic) by the amount of the unsecured claims."

*In re Yasparro, supra,* pages 98–99.

■ Here, debtors seek to retain the ownership of their real estate after paying FLB the allowed secured claim under the plan, which claim was determined by the court after a valuation hearing. Debtors receive no new stock in a corporation, nor any new property, but only retain ownership of property subject to a lien for its full present value as of the date of the plan. *Ahlers* itself recognizes that "[i]ndeed, even in a sole proprietorship, where 'going concern' value may be minimal, there may be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business." *Ahlers*, 485 U.S. at 208, 108 S.Ct. at 969, 99 L.Ed.2d at 180. Thus, although it would be neither fair nor equitable for the Court to apply this "new value" exception only to a corporate reorganization, the individual debtors must nevertheless demonstrate some basis on which the Court can postulate a value of the retained interest.

By debtors' counsel's own admission in oral argument, debtors have adduced no evidence on which this court could affix any value to such interest. Indeed, since debtors are by their plan attempting to retain the property on which this creditor holds a mortgage and on which debtors propose to pay only the allowed secured claim pursuant to the valuation determined by the Court, are debtors required to prove a negative? If debtors pay the principal and interest, is not the value of the real estate *per se* quantifiable at no value or at a negative value? Debtors are not, however, forced into such an anomalous position, for the following reason. Debtors might have introduced evidence to establish a future value of the interest in the real estate should the market improve. As not-

ed in *Greystone*, "[i]n order to evaluate whether the participation proposed to be afforded the equity investor is commensurate with the capital infusion, the bankruptcy court must be prepared to value all aspects of the enterprise." 102 B.R. 560 at 579. Earning capacity, "capitalized future net revenues," going concern values, the value of creditor's control are all factors which, although "difficult to quantify" (102 B.R. at 580, 581) might permit the Court to determine the equivalence of the contribution to the retained interest. As it stands, the proposed equation is incomplete. The only earning capacity addressed at the hearing is in debtors' Exhibit 1.

The debtors list "income" as follows:

| | |
|---|---|
| Total "income" 1989 | $144,351.35 |
| Less "expenses" | 133,440.00 |
| Net | $ 10,911.35 |

Included in debtors' "income" however, is income not related to the enterprise, i.e., Social Security totalling $10,580.00, an amount so close to the "net" figure shown that it could scarcely be a basis of demonstrating the value of and interest to be retained.

Again having reached a turning point, this opinion could simply terminate the discussion and deny confirmation. However, some cases interpreting the matters at issue have seemingly considered only the "substantiality" of the proposed contribution. See, for example, *In re Rudy Debruycker Ranch, Inc.* 84 B.R. 187 (Bkrtcy. D.Mont.1988), which concluded that debtor's proposed cash contribution of $50,-000.00 and pledge of receiving only support instead of a salary was insufficient, and "pale[d] into the 'de minimus' category."

Here, debtor proposes to surrender a life insurance policy to the creditors. The testimony of Mr. Alton Townsend, Jr., the insurance agent who worked with debtors on their insurance portfolio, testified that the policy is presently within a few months of lapse for non-payment of premiums. The policy is a "universal life" policy, which uses accumulated "cash value" to pay premiums. The annual premiums required are $11,590.00. (Exhibit Dowden 4). Absent such a payment within the very near fu-ture, the policy will lapse. On the date of the hearing, the witness testified that the policy had a present surrender value of only $2000.00 to $2400.00.

Debtors focus, however, on the value of the policy upon Mr. Dowden's *death*, which is the face amount of the policy, or $500,-000.00. Mr. Dowden is in ill health, having undergone surgery for cancer. His age and medical history suggest that his life expectancy is short at best.

■ Nothing, however, in the cases cited or examined by this Court suggests that any value is worthy of consideration other than present value. To hold otherwise would do violence to the clear language of the Code. Further, present value cannot on these facts but be offset by debtors' proposal that the creditors pay the premiums on the policy. Moreover, since the debtors' property contributed is exempt under state law, the proposed contribution may be facially defective. In *Matter of Yasparro, supra*, the Court outlined five factors for the "money's worth" exception, as follows:

1. Is the contribution money or other tangible property?
2. Is the tangible property freely tradeable in the economy?
3. Is the capital investment a present contribution rather than a contribution to take place in the future?
4. Is the capital investment a new contribution to the reorganized debtor?
5. Is the contributor bearing an economic risk by making the contribution?

*Matter of Yasparro*, 100 B.R. at 99.

The contribution here is tangible, at least as to the present surrender value, the only relevant factor. But this Court cannot conclude that it is "freely tradeable in the economy," since it is exempt. Although it constitutes a "present contribution," (at least as to the surrender value) the economic risk to the contributor is at best slight. There is no evidence here that, absent acceptance of the proposed plan, debtor intends to pay the premiums as they fall due to avoid lapse of the policy. The

risk here falls to the creditor, who is obliged to pay the premiums.

Further, as mentioned *supra,* the contribution here is not to the enterprise, which would retain no ownership interest in the policy. The contribution is to the unsecured creditor class which, as noted, must bear the expense of maintaining its limited present value. Even if this Court could postulate some correlation of the value of the contribution to the interest retained, and such contribution was made to the enterprise, the insistence of the debtors that the creditors bear the cost of the premiums is potentially fatal to the proposal.

The proposal here submitted by debtors fails on all counts. The proposed contribution is not demonstrated to. be necessary for effectuation of the plan, nor has it any demonstrated relevance to the interest to be retained. Even assuming value of such retained interest for purposes of argument, the cost factor imposed upon the creditors makes the retained interest disproportionate to any conceivable present value of the contribution. Confirmation must be denied.

"[T]he enterprise first 'belongs' to its unsecured creditors." *Greystone, supra* page 578. Although FLB might (as did the creditor in debtors' prior chapter 11) have elected to take debtors' offer of an insurance policy and agreed to pay the premiums sufficient to ensure its recovery, the ultimate success of which is absolutely clear (for nothing is certain but death and taxes), FLB may not be compelled to accept such an arrangement without its consent. The "control" of a reorganized entity has value. (See 93 Com.L.J. 303, Footnote 25, *supra,* and cases cited therein.) Creditor here has sought to exercise its rights of control. Absent its consent, its choice can only be circumscribed by the exception discussed herein, the availability of which debtor has failed to show. Debtors may well point the finger of blame at the creditor, as the creditor's decision may force debtors out of business. Nonetheless, "[a] creditor is entitled to make this determination, and if the creditor, for whatever reason, wishes to seek a pound of flesh rather than be paid through a reorganization, he is free to do so. If the debtor cannot comply with the provisions of Section 1129, the plan cannot be confirmed." *In re Sawmill Hydraulics, Inc.* 72 B.R. 454 at 56 (Bkrtcy.C.D.Ill.1987).

This Court reaches these inescapable conclusions reluctantly. As is the case in *Greystone,* "the lender does not know what's good for it." *Greystone, supra* at Footnote 27. There seems to be no apparent reason why FLB does not assent to the debtors' proposed treatment, which would appear to both satisfy the best interest of creditors and have the prospect of a greater recovery to the objecting creditor than it will receive if it obtains its "pound of flesh." But the exception to the absolute priority rule under *Case* is narrow in scope, and may be applied only when clearly applicable. On these facts, debtors' proposal is nothing more than an effort do repurchase their ownership interest. It is the present exchange of a biscuit for a sack of flour. The dissenting creditor may not be compelled to wait for the insured's death and pay the premiums for the offering to materialize into a more enticing return.

## CONCLUSION

Having reached these conclusions on these issues alone, this Court declines to make any other findings concerning debtors' plan of reorganization. The confirmation of debtors' plan is denied. Debtors are allowed 15 days from this date to amend the plan.

A separate conforming order will enter.