**In re John T. BATTEN, Jr. d/b/a Riverside Farm Partnership, Kathleen P. Batten.**

**Bankruptcy No. 91BK–81434.**

United States Bankruptcy Court, W.D. Louisiana, Alexandria Division.

June 10, 1992.

Gregory T. House, Arens and Alexander, Fayetteville, Ark., Robert L. Royer, Atty. at Law, Alexandria, La., for debtors.

R. Raymond Arthur, Murchinson, Crews, Arthur and Corkern, Natchitoches, La., for Exchange Bank and Trust.

Kenneth D. McCoy, Jr., McCoy & Hawthorne, Ltd., Natchitoches, for Farm Credit Bank of Texas.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter comes before the Court concerning the Disclosure Statement filed by the Debtors herein on May 18, 1992. This Disclosure Statement is styled the Third Amended Disclosure Statement. The matter was taken under advisement after a hearing on May 27, 1992. This is a Core Proceeding pursuant to 28 U.S.C. Section 157(b)(2)(L). Although the approval of a disclosure statement is not expressly designated as a core proceeding under the Code, it is an integral part of the plan confirmation process. This Court has jurisdiction pursuant to 28 U.S.C. Section 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these Reasons, the Third Amended Disclosure Statement filed by the Debtors is found deficient and is disapproved.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Background

These debtors filed a petition for voluntary relief under Chapter 11 of the Bankruptcy Code on October 15, 1991. This case is closely related to the case of Daisy M. Prudhomme, No. 91–81053. A detailed history of the instant case is set forth in this Court's Reasons for Decision dated January 31, 1992. Daisy M. Prudhomme is

a sister of Kathleen Prudhomme Batten. Daisy Prudhomme's case was filed July 30, 1991. This Court previously approved a Disclosure Statement and Plan in the Prudhomme case filed on behalf of the Farm Credit Bank of Texas ("FCB").[1] FCB, as plan proponent, thereafter confirmed a plan in that case. Certain properties in that estate were transferred under the confirmed plan to a Trust, of which H.A. Boughton is the liquidating trustee. It is significant to note that prior to confirmation in Prudhomme, this Court lifted the automatic stay affecting the bulk of the property in that estate on February 11, 1992, as a result of debtors' default in adequate protection payments. A Sheriff's Sale was conducted on May 6, 1992. FCB was the successful bidder.

In the instant case, a disclosure statement filed on behalf of the Farm Credit Bank was approved by this Court by order dated May 13, 1992. The scheduling of a hearing on the FCB's plan was deferred pending a hearing on the Debtors' Disclosure Statement.

Debtors' Original Disclosure Statement was filed February 12, 1992. A hearing was scheduled for March 25, 1992. Objections to that Disclosure Statement were filed by FCB, Exchange Bank & Trust Company ("Exchange"), and the United States Trustee ("UST"). Pursuant to an order dated March 25, 1992, debtors were allowed 15 days to amend the disclosure statement. The hearing was continued to April 15, 1992.

On April 9, 1992, Debtors filed a First Amended Disclosure Statement. FCB, Exchange and UST all objected. Pursuant to an order dated April 15, 1992, debtors were again allowed 15 days to amend the Disclosure Statement. A hearing was scheduled for May 13, 1992. On April 30, 1992, Debtors filed a Second Amended Disclosure Statement. FCB, Exchange and UST objected. Pursuant to an order dated May 13, 1992, Debtors were allowed 15 days to amend the disclosure statement. The hearing was continued to May 27, 1992.

On May 18, 1992, Debtors filed a Third Amended Disclosure Statement. FCB objected and filed a supporting memorandum. Debtors were allowed until June 3, 1992, to file a memorandum in support of the Disclosure Statement.

At this juncture in the filings, it appears that the only substantial progress made by the debtors is the elimination of two of the three objections. This Court is compelled to observe, however, that the Debtors might have addressed the Exchange objection at a much earlier date. The original objection filed by Exchange on March 19, 1992, concerned the allegation that the Disclosure Statement did not treat a proof of claim filed by Exchange on November 8, 1991, in the amount of $46,909.43. That proof of claim allegedly arose by virtue of a judgment dated April 21, 1987. The exhibit to the objection reflects a judgment rendered in the Tenth Judicial District Court for Natchitoches Parish, LA, under Docket No. 57,782, in which these debtors are named as defendants. Judgment was rendered against them *in solido* in the amount of $25,000.00. The objector noted that the debt was ignored in its entirety in the debtors' Disclosure Statement. Exchange then made the exact same objection in connection with the Debtor's First Amended Disclosure Statement.[2]

In the Second Amended Disclosure Statement, Debtors finally made brief mention of the judgment claim, asserting on page 12 that "... the ... judgment is void as it was obtained while the Debtors were attempting to reorganize under Chapter 12 of the Bankruptcy Code and ... in violation of the [automatic] stay...." Debtors did not, however, create a separate class for the creditor or specifically describe any treatment to be afforded the claimant; this despite repeated assurances from counsel to debtors, Mr. House, that efforts would

1. The Farm Credit Bank's Original Disclosure Statement in the Prudhomme case was not approved. *See* Reasons for Decision dated February 10, 1992.

2. The objections by Exchange do not relate to an additional claim which has been consistently treated in the disclosure statements, the latter relates to a "Cane River Gin Co., Inc." claim.

be made to cure all objections. Accordingly, Exchange again objected.[3]

Only on the filing of the Third Amended Disclosure Statement, did the debtors, for the first time, specifically (at page 13) treat Exchange in Class Four. That treatment provoked no further objection. These Reasons now turn to a discussion of the remaining objection, that of FCB.

### FCB's Objections

This Court's Reasons for Decision dated January 31, 1992, described the position of FCB as follows:

"Additionally, if the current case is permitted to proceed to the stage of hearing on confirmation of any plan proposed by these Debtors, and if under the terms of the proposed plan the Debtors seek to retain, directly or indirectly, any interest in the Collateral, the Bank confirms that it will at that time plead the "absolute priority rule" in opposition to such plan, thereby precluding potential confirmation of any plan in which the Debtors seek to retain, directly or indirectly, any interest in the Collateral. There is, therefore, no long-range benefit to the Debtors presented by this current proceeding. *See Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture* [127 B.R. 138 (W.D.Tex. 1990)]." [Citation, *infra*].

Motion filed December 26, 1991, Article VII.

Although, on rehearing, the original opinion of the Fifth Circuit in *Greystone* was revised by deleting those portions of the opinion concerning the new value exception to the absolute priority rule (see discussion at pages 907–09 *et seq., infra*), there has been no change in FCB's opposition to debtors' proposed reorganization.

Prior objections of both the UST and FCB related to a proposed transfer to Debtors' son, John T. Batten, III. The present disclosure statement and plan does not involve a transfer to that individual, but, like its predecessors, proposes a redis-tribution of property. Debtors propose to retain property in their estate and to acquire interests in property in the related Prudhomme case. The latter property interests were either; (1) the subject of the lift stay order and subsequent Sheriff's Sale or; (2) were transferred to the trust under the supervision of Mr. Boughton pursuant to the confirmed plan in Prudhomme.

With this background, we turn to a discussion of the Third Amended Disclosure Statement and FCB's current objections. FCB has sought (without waiving prior objections) to focus on two allegedly fatal flaws. The first such flaw relates to the basic redistribution/retention scheme. The second allegedly fatal flaw concerns the treatment of other collateral (on which FCB has a mortgage) leased to a wholly owned partnership of the debtors known as Riverside Farms Partnership. This entity allegedly owns all of the debtors' farm implements and equipment valued at $100,-000.00. FCB asserts that the plan proposes to have debtors assume some portion of the partnership debts and acquire all or substantially all of the equipment. FCB asserts that this treatment is violative of the laws and public policy of the State of Louisiana, particularly the distribution scheme relating to the liquidation of partnership property.

These Reasons for Decision need not reach the partnership issue, for this Court agrees with FCB's first contention.

### Summary of the Proposed Plan

Debtors' present treatment of the properties is described as follows:

"The Debtors' plan of reorganization proposes that the Debtors' interest in approximately 357.38 of the total 738.64 acres of farmland will be retained at the fair market value [$750,000.00] determined by the Court in an Order Dated February 7, 1992.... Debtors will purchase the interest of Farm Credit Bank of Texas ("FCB") on May 6, 1992, and

---

**3.** If debtors wished to persist in their opposition to this creditor's claim, the proper way to do so was by placing the claim in a specific class and disputing it. Many plans propose to pay nothing on such disputed claims.

retain their interest in approximately 357.38 acres of this farmland, consisting of approximately 100 acres of land valued at $350.00 per acre and 265 acres of land valued at $1,000.00 per acre. The balance of 357.28 acres of the farmland upon which Daisy Prudhomme or the FCB either holds an undivided interest or a secured claim will be abandoned by the debtors. This farmland consists of approximately 82.8 acres of property at 350 per/acre [sic] and 252.1 acres appraised at $1000.00 per acre for a total value of $293,840. Debtors will also purchase Daisy M. Prudhomme's and/or FCB's interest and retain their interest in the lakefront lot directly adjacent to Shell Beach, consisting of 1.31 acres for its appraised value of $6,762.00, making the total value of land purchased or retained by Debtors $293,840. Exact legals on the farmland retained will be determined by survey. A detailed sketch of the property, setting forth the farmland which will be purchased or retained by the Debtors in pink and the land which will be abandoned to the FCB in yellow, is attached to this disclosure statement as Exhibit 'A.'

The Debtors will also abandon the two camp houses valued at $50,000.00 and 21.89 acres of the lakefront development land valued at $112,320, making the total value of non-farmland abandoned to the Farm Credit Bank of Texas $162,320. However, Debtors reserve the right to sell the camp house to the existing lessees if they elect to purchase same at their appraised value until the time of confirmation. A detailed sketch showing the nonfarm land proposed to be abandoned back to Farm Credit Bank of Texas in black is attached hereto as Exhibit 'B.'

The value of the non-farmland abandoned to Farm Credit Bank of Texas in the amount of $162,320, together with the abandoned farmland valued at $293,840.00 and the cash proceeds distributed to the FCB in the amount of $293,840.00 will provide Farm Credit Bank of Texas with the present value of its secured claims of $750,000.

Debtors will pay Farm Credit Bank of Texas interest at the rate of 7% per annum on $293,840.00 until date of closing of all of the sales anticipated by the plan. The sums will be paid by December 1, 1992; however the adequate protection payments paid by Daisy M. Prudhomme are to be applied to the outstanding interest accrued from the effective date of the plan until closing as the Farm Credit Bank of Texas, being an undersecured creditor, is not entitled to post-petition interest prior to confirmation."

Third Amended Plan, pages 9–11.

The Disclosure Statement describes seven classes of creditors as follows:

Class 1: Administrative Claims.

Class 2: FCB's claim in the amount of $750,000. The treatment of this claim is discussed above.

Class 3: Fully secured claim of Aulds, Horne & White on Debtors' residence.

Class 4: Exchange Bank's Claim under the judgment, treated as fully secured, payable in monthly installments.

Class 5: General Unsecured Claims per Exhibit G, to receive a dividend of $9371. FCB is the sole creditor listed for an unsecured claim of $870,232.86.

Class 6: Exchange Bank's Cane River Gin Company claim. Any portion of this claim not paid by Cane River Gin Company is relegated to Class 5 and shares in the dividend.

Class 7: Debtors' equitable interests. "Debtors will retain their equity interests in selected property under the plan by contributing new value to the plan equal or in excess of the current equitable interests."

*Disclosure Statement Requirements*

11 U.S.C. § 1125(d) requires that "... acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information." Under Section 1125(a), " 'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan; . . . ."

In addition to the requirements of Section 1125, Local Bankruptcy Rule 4.3 mandates that a disclosure statement should normally include certain information. Among those is the requirement that a disclosure statement contain a "[d]escription of the classes established in the plan and a summary of the plan."

The thrust of FCB's argument is that the debtors' proposed "purchases" and "abandonments" must be considered against a "backdrop" consisting of this Court's order of confirmation and concomitant trust arrangement (which affects two smaller tracts of farmland) in the related Prudhomme case and the Sheriff's Sale to FCB of Daisy Prudhomme's interest in the larger tract. FCB continues to hold the mortgage on the bulk of these debtors' estate. FCB first asserts that the plan violates its rights as mortgagee under state law. It argues that a mortgage is indivisible, citing La.Civil Code Article 3280, *Lawton v. Smith*, 146 So. 361 (La.App.2d Cir.1933), and *Bagley v. Tate*, 10 Rob. 45 (La.1845). FCB is now a co-owner of the former Prudhomme interest, and the mortgagee on debtors' remaining interest in the co-owned property. It maintains that the selective division of the property contemplated by Debtors' plan violates Louisiana law, particularly Civil Code Articles 807, 809, 810 and 811 relating to partition. Pursuant thereto, a partition should be in kind, unless impossible, in which event the partition is by licitation. "There is absolutely no suggestion in Louisiana law, in the context of a judicial partition in kind, that a former co-owner can select the parcel or parcels of the formerly co-owned property that he desires to retain." Memorandum, page 9.

FCB then inquires whether the Bankruptcy Code overrides state law, noting in its memorandum that the present plan and disclosure statement (unlike its predecessors) make no mention of 11 U.S.C. § 363 as a means to the Debtors' end. While § 363(h) may permit the *sale* of a debtor's interest in property, there is no suggestion that it might be used to compel a *purchase* by the debtor from a non-debtor co-owner. Further, it asserts, if § 363(h) applies, then FCB or the trustee under the confirmed Prudhomme plan, must be afforded a right of first refusal to re-acquire the property.

As to those portions of the property on which FCB holds a lien (in which event any sale would be governed by section 363(f)), FCB argues that 11 U.S.C. § 363(k) would grant it a right to credit bid in any sale under § 363(b).

In short, FCB argues, the plan seeks to " . . . shift to the Bank all market risk that certain portions of the Bank's collateral will realize full appraised value upon liquidation by the Bank." Memorandum, page 11. Relying upon *In re Walat Farms, Inc.*, 70 B.R. 330 (Bankr.E.D.Mich.1987), FCB asserts it will not receive the indubitable equivalent of its claim, and, "[i]f courts are unwilling to force divisions or releases or portions of collateral upon oversecured creditors, there should be even greater reluctance to do so upon undersecured creditors who do not have the luxury of a margin for error." Memorandum, Page 12.

### Discussion

Debtors have not cited any express authority (having relied on 11 U.S.C. § 105 in oral argument) to compel a co-owner to sell its interest in property to the other co-owner absent the former's consent. In their post-hearing memorandum, they concede no code provision specifically addresses this issue.

As noted by FCB's counsel in oral argument and post-hearing response, " . . . whatever equitable powers remain in the bank-

ruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In their post-hearing memorandum, at page 3, debtors concede that the bankruptcy court's equitable powers are not without limits.

Despite the agreement of counsel for both Debtors and FCB that no specific codal provision avail the debtors, these Reasons now turn to a consideration of whether 11 U.S.C. § 363 can be interpreted in a fashion so as to allow debtors to prevail.

### 11 U.S.C. § 363

■ Under 11 U.S.C. § 363(b)(1), "the trustee [or debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

■ Only § 363(h) makes reference to a partition. Under that section, the trustee, or derivatively the debtor-in-possession, may sell a co-owners' interest in property together with the estate's interest only if the conditions of that section are met. All of the requirements of Section 363(h) must be met prior to a sale pursuant to same. *In re Hendrick,* 45 B.R. 976 (Bkrtcy. M.D.La.1985). Although the section has been interpreted broadly, *see e.g., In re Bell,* 80 B.R. 104 (M.D.Tenn.1987), the problem the debtors have is that they cannot meet the first test set forth for a sale under that section. They must first demonstrate that a partition in kind is impracticable. This sub-section is construed most frequently in cases involving the sale of a residence, because there is no "... practicable manner the property can be partitioned other than by sale of the property and division of the proceeds." *In re Brown,* 33 B.R. 219 (Bkrtcy.N.D.Ohio 1983), *citing Morris v. Ivey (In re Ivey),* 10 B.R. 230, 7 B.C.D. 562 (Bkrtcy.N.D.Ga. 1981).

Nothing in the evidence adduced at the valuation hearing on the subject property conducted January 29, 1992, suggests that a partition in kind *per se* of this farmland property is not practicable. The valuation summary of the subject property at page 94 of the appraisal, Exhibit p–1, describes the property as follows:

| | | |
|---|---|---|
| Higher Quality Portion of Subject | 517.1 Acres at $1000/acre | $517,100.00 |
| Lower Quality Portion of Subject | 182.8 Acres at $350/acre | $63,980.00 |
| Value of 24 Cane River Lake Front Lots | 23.2 Acres at $5131/acre | $119,041.00 |
| Value of 2 Improved Cane River Lake Front Lots | | $50,000.00 |
| Value of Rights-of-Way | | 0 |
| | | $750,121.00 |
| | Rounded to | $750,000.00 |

Similarly, section 363(f) does not avail the debtors, since all the requirements of subsections (1) through (5) must be met. Here, the lien on the subject tract in favor of FCB far exceeds the proposed sale price under the plan. The total of the indebtedness due FCB exceeds $1.6 Million Dollars. *See Reasons for Decision,* January 31, 1992. Under § 363(f)(3), a sale free and clear of liens will not lie.

Absent a contract of sale between FCB and debtors, or FCB's consent to the proposed plan, debtors' forced purchase/partition scheme must fail. The Bankruptcy Code does not provide for such an arrangement and neither "equity" nor due process

considerations justify forcing a third party to sell its property without its consent.

Having demonstrated that section 363 will not permit debtors to sell the interest of FCB in the subject property, or, indeed, prevent the credit bid or purchase option in favor of FCB, these Reasons now address the issue of whether a bankruptcy court can compel a partition of property.

### Does the Court have the Power to Partition?

■ Implicit in FCB's argument is the suggestion that such power is lacking. This Court disagrees. If the court has the authority to sell the co-owners' interest in property where a partition in kind is not "practicable," *a fortiori ratione*, it can compel a partition in kind where such is practicable. In this regard, Debtors cite *Provencher v. Berman*, 699 F.2d 568 (1st Cir.1983). In that case, the Court actually rejected the notion that a bankruptcy court could partition property. In doing so, however, the Court noted that the case actually arose under the Bankruptcy Act of 1898. It cited numerous cases, 699 F.2d at 571, as authority for the proposition that partition was not "within the administration functions of the bankruptcy court." Noting that, under section 363 of the Code, which contains what it described as a "partition-like remedy," the Court ultimately declined to exercise the power, suggesting that if an arrangement satisfactory to the trustee did not result, the partition should proceed in state court.

Had debtors proposed a plan that would simply partition the property in kind, such a plan would, at cursory examination, have had some appeal. However, it has been held that the encumbrance of a tract as a whole which secures a debt in excess of the value of the property makes physical partition impracticable. *See In re Haley*, 100 B.R. 13 (Bkrtcy.N.D.Cal.1989).

In an unrelated case, *Alderson, infra*, this Court has given its imprimatur to a partition-like arrangement with regard to a

§ 362(d)(2) showing on a motion to lift the automatic stay where debtor filed a disclosure statement proposing a transfer of property. These Reasons turn to a discussion of whether the arrangement proposed here might otherwise be confirmable.

### Requirements for Confirmation

The Court can confirm a plan only if all of the requirements of Section 1129(a) are met. That section includes the requirement that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." Under § 1129(a)(10), if a class is impaired under the plan, at least one impaired class must accept.[4] Acceptance is governed by § 1126(c).

Faced with the certainty of an opposing ballot by FCB, these Debtors would be required to affirmatively move for a "cramdown" pursuant to Section 1129(b), providing fair and equitable treatment of the dissenting class. That showing requires that Debtors comply with the alternative tests of § 1129(b)(2)(A)(i), (ii), or (iii). This plan cannot be said to provide for the retention of FCB's lien on its collateral as required by subsection (i); inasmuch as it proposes to dismember the same. These Reasons have already indicated that a sale under § 363(k) is not possible. Therefore, subsection (ii) is inapplicable.

The third test, § 1129(b)(2)(A)(iii), is the requirement that the plan be fair and equitable with respect to a class of secured creditors by providing for the "realization by such holders of the indubitable equivalent of such claims." In *In Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir.1989), the Court observed:

"This 'indubitable equivalent' language is at the heart of the current case, and fortunately its application is relatively straight-forward. The key determination is the precise meaning of the phrase 'such claims,' and our inquiry concludes that 'such claims' can only mean *secured* claims. Section 1129(b)(2) is divided into

---

**4.** Given this requirement, debtors' delay in removing the objections of Exchange to the disclo- sure statement is incomprehensible.

several subsections. Section 1129(b)(2)(A) deals with secured claims, while section 1129(b)(2)(B) deals with unsecured claims. Since the 'indubitable equivalent' language is part of section 1129(b)(2)(A), it deals only with secured claims, and thus section 1129(b)(2)(A)(iii) can be accurately read to state 'the realization of the holders of secured claims of the indubitable equivalence of their *secured* claims.'"

881 F.2d 1346 at 1350.

■ This Court has held that a proposed transfer of property (essentially a partition) in favor of an oversecured creditor, is not "unworkable on its face." *See In re Howard Allen Alderson,* Reasons for Decision, April 13, 1992, Case No. 91BK–13126.[5] In *Alderson,* in addition to the fact that the creditor was oversecured, it had entered into an agreement with other mortgage holders concerning the distribution of the proceeds of sales of the property, also, a liquidating plan was proposed. Those facts are not present here. The Battens wish to dismember a tract encumbered by a lien in favor of a greatly undersecured creditor.

A secured creditor in Chapter 11 is entitled to its "bargained for rights." *Matter of Peterson,* 95 B.R. 663 (Bkrtcy.W.D.Mo. 1988). Those rights include protection from a forced dismemberment of its collateral.

Assuming, *arguendo,* that debtors could surmount the obstacle course of affording FCB the indubitable equivalent of its secured claim, debtors must then deal with its unsecured claim by overcoming the absolute priority rule. *See Ahlers, supra.*

### Absolute Priority Rule and the New Value Exception

This Court has previously adopted the analysis expressed in *In re Greystone III*

*Joint Venture,* 102 B.R. 560 (Bkrtcy. W.D.Tex.1989), *affirmed* 127 B.R. 138 (W.D.Tex.1990), *reversed, Matter of Greystone, III Joint Venture,* 948 F.2d 134 (5th Cir.1991); *corrected, reinstated, reh, en banc, den.,* February 27, 1992.[6]

The bankruptcy court's opinion in *Greystone* concludes that the exception known as the "new value" or "money's worth" exception as it was articulated in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1930) continues to exist after the holding of the Supreme Court in *Ahlers, supra,* as an extension of the fair and equitable rule. Although the Fifth Circuit's original opinion reversed the district court and bankruptcy court's holding, the modification to the former's original opinion deleted those portions of the original opinion which affirmatively held that the exception did not survive with the enactment of the Bankruptcy Code. In withdrawing those portions of its original opinion, the Fifth Circuit stated that it "... expressed no view whatever on that part of the bankruptcy court's decision."

The rule has been defined as follows:

"The absolute priority rule, in its simplest terms, requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests—such as those of equity holders—may share in the assets of the reorganized entity."

*The New Value Exception to the Absolute Priority Rule: Is Ahlers the Beginning of the End?,* 93 Com.L.J. 303, No. 3 (Fall 1988).

---

**5.** To the extent that this Court's holding in *Alderson* may disagree with *Walat, supra,* this Court's holding in the former is based on its interpretation of the Fifth Circuit's holding in *Sandy Ridge.* During the hearing on this disclosure statement, counsel for FCB and the Court conducted a colloquy as to whether a transfer of less than the full amount of property to a secured creditor encumbered by its lien might ever constitute the indubitable equivalent of its claim. Counsel for FCB reluctantly conceded

that it "might" if the creditor was "massively" oversecured. At a minimum, this Court would suggest that the creditor would need to be at least fully secured to the extent of the value of the surrendered portion.

**6.** This Court originally adopted the *Greystone* analysis in Reasons for Decision dated November 8, 1989, in the matter styled *In re William Elmer Dowden et al.,* 143 B.R. 388.

■ In order to qualify under the exception, debtors must first show the necessity for the capital infusion. Debtors must then meet a further test regarding the infusion. It must be substantial, and must equal the value of the retained interest. *See Greystone*, 102 B.R. 560, at 576. *See also In re Pullman Const. Industries, Inc*, 107 B.R. 909 (N.D.Ill.1989). The substantiality prong analysis is itself divisible. In *Matter of Yasparro*, 100 B.R. 91, at 99 (Bkrtcy.M.D.Fla.1989), the Court propounded the following factors for the "money's worth exception."

1. Is the contribution money or other tangible property?

2. Is the tangible property freely tradeable in the economy?

3. Is the capital investment a present contribution rather than a contribution to take place in the future?

4. Is the capital investment a new contribution to the reorganized debtor?

5. Is the contributor bearing an economic risk by making the contribution?

Both UST and FCB raised objections to prior disclosure statements based on lack of information regarding the proposed new value. *See* Objection by UST filed May 12, 1992; Objection by FCB filed May 8, 1992. Moreover, FCB repeatedly asserts the exception does not exist.

■ In the Third Amended Disclosure Statement, Debtors opine that the "plan is guaranteed of success because the funds to pay all creditors will be obtained from outside third parties through refinancing at confirmation or shortly thereafter."[7] Third Amended Disclosure Statement, page 16. Here, it readily appears that debtors have confused refinancing with a new capital contribution. Debtors must do more than simply throw money on the table from refinancing.

■ Further, there is no stated correlation between the so-called contribution and the debtors' farm enterprise. There is no suggestion of a desire or need to pay trade debts, current farm expenses, or laborers. Here, the debtors proposed payment (not really a contribution at all) is intended for the sole purpose of retaining ownership, a sort of "I think therefore I am" analysis that flies in the teeth of the exception to the absolute priority rule. *See In re Dowden*, 143 B.R. 388 W.D.La., Reasons for Decision dated November 8, 1989.

In *Dowden*, this Court analyzed the new value exception to the absolute priority rule extensively. Further, on very similar facts, it found the debtors' showing insufficient. Those reasons further discussed the impediments that the individual, as to opposed to a corporate debtor, must surmount in meeting the requisite showing.

As the bankruptcy court observed in the original *Greystone* opinion, "the enterprise first 'belongs' to its unsecured creditors." 102 B.R. 560 at 578. The control of a reorganized entity has value. (93 Com.L.J. 303, footnote 25, *supra*, and cases cited therein.) Here, FCB shows no sign of relinquishing its rights of control. Absent its consent as an unsecured creditor, its choice can only be circumscribed by the exception discussed here.

■ In its original Reasons in this case, on FCB's motion for relief from the stay, this Court "defer[red] to the possibility of the debtors proposing a feasible plan" and conditioned the automatic stay accordingly, allowing the debtor 75 days from January 31st to confirm a plan. The Court indicated that it would entertain a renewed motion for relief at that time.

That period has now passed. This Court noted in its oral reasons allowing additional time for these debtors to amend their disclosure statements that some additional grace period was justified by the uncertainty emanating from the Fifth Circuit's original opinion in *Greystone* and its subsequent modification. The original Fifth Circuit holding in that matter was largely the cause of the Court's original pessimism.

Whatever accommodation period (beyond this Court's original 75 day period) that

---

7. This statement is misleading. If the debtors could propose a plan to pay FCB in full, they would have no need to overcome the absolute priority rule.

may have been warranted by those events no longer exists. No further extension of time is likely to result in a subsequent disclosure statement and plan with the Debtors as plan proponents that will receive FCB's support. That conclusion is buttressed by the already tortured process reviewed at pages 901–02, *supra.* Only after repeated (albeit occasionally perfunctory, at best) efforts have debtors narrowed the opposition to their disclosure statement to one opponent. That opponent has itself filed a competing disclosure statement and plan. Its disclosure statement has been approved. Its plan awaits the scheduling of a confirmation hearing.

On these facts, this Court is in accord with the position of FCB; that is, that the plan is so fatally flawed that it need not proceed to confirmation. *See In re Pecht,* 57 B.R. 137 (Bankr.E.D.Va.1986); *In re Century Investment Fund VIII Limited Partnership,* 114 B.R. 1003 (Bankr. E.D.Wisc.1990) (dictum); *In re Eastern Maine Electric Cooperative, Inc.,* 125 B.R. 329 (Bankr.D.Maine 1991). Notwithstanding Debtors' strong appeal to this Court's equity powers, those powers cannot be used to override the Code and confirm a plan so inherently defective.

## CONCLUSION

For the reasons previously set forth, the Third Amended Disclosure Statement filed by the Debtors is found to be deficient. A separate, conforming order will enter, disapproving the same. Having deferred the setting of a hearing on confirmation of the plan previously filed by FCB pending this ruling, a separate order will enter directing the scheduling of such hearing.